# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2009

Charles R. Fulbruge III
Clerk

No. 07-40325

THELMA ALANIZ; NOELIA GALVAN SANTIAGO;
MARY E TIPTON; ANGELICA SOLIS,

                                    Plaintiffs–Appellees,

v.

JORGE C. ZAMORA-QUEZADA, Individually and doing business as McAllen
Arthritis & Osteoporosis Center, Arthritis & Osteoporosis Centers and Jorge
C. Zamora-Quezada, MD, MPH, PA,

                                    Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:03-CV-108

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

This is an appeal from a jury verdict rendered against Dr. Jorge Zamora-Quezada (Zamora) and his clinics for sex discrimination and retaliation against four female employees. We affirm the judgments for three Appellees but reverse for insufficient evidence to support Noelia Galvan-Santiago's (Galvan) quid pro quo claim.

## I

Dr. Jorge Zamora owns and operates an osteoporosis and arthritis practice

consisting of two clinics. Four former employees, Thelma Alaniz, Galvan, Mary Tipton, and Angelica Solis, brought Title VII sexual harassment claims against Zamora and the clinics.

**A**

Alaniz worked as a receptionist at one of the clinics. She alleged that Zamora sexually harassed her on many occasions: he frequently asked her out, forced her to dance with him, and when learning she was pregnant, asked whether her husband "gave [her] the chocolate." Zamora would also call her to his office for private meetings where he would sit next to her and caress her hand while looking into her eyes and asking if she was afraid of him.

Alaniz also alleged that Zamora's father-in-law and her supervisor, Roberto Silva, consistently harassed her. Among other behaviors, Silva inappropriately stared at parts of Alaniz's body, repeatedly called her "mamacita," and suggested that she wear more revealing clothing.

Zamora's conduct worsened after Alaniz returned from maternity leave. On one occasion, he told her she was "looking pretty good" and not to get pregnant again. He also called her repeatedly to ask what color underwear she was wearing and during meetings in his office, Zamora would sometimes rub her thighs and knees. Despite Alaniz's repeated complaints to the office manager, Zamora's behavior continued. On one occasion, when Alaniz went into his office, Zamora grabbed her around the waist and kissed her on the lips.

Zamora then informed Alaniz that there were some problems with her performance but that she could keep her job if she had a sexual relationship with him. Alaniz refused and submitted a written complaint to Galvan, the human resources (HR) manager. Several days later, she initiated a complaint with the Equal Employment Opportunity Commission (EEOC).

After Alaniz missed a mandatory work meeting, Zamora instructed Galvan to issue Alaniz a written reprimand. However, before the reprimand could be

given and after Zamora was informed of the EEOC complaint, he instructed Galvan to terminate Alaniz. Zamora claims Alaniz was fired for missing the meeting, poor performance and attendance, conflicts with other employees, and recruiting witnesses for a lawsuit during business hours.

**B**

Galvan was initially hired as HR manager but she claims, and Zamora disputes, that after Alaniz's termination she became an "office administrator." On one occasion, Galvan met with Zamora in his office, and he began the meeting by asking her to sit on his lap. When she refused, he explained she could make more money if she engaged in a sexual relationship with him. Zamora then inquired about Galvan's marriage and whether she found Zamora attractive or frightening. Ultimately, Galvan started crying.

The next day, Zamora announced that another individual would be assuming the position of "office administrator," thus stripping Galvan of any responsibilities she may have had in that capacity. Galvan's salary, benefits, and role as HR manager were unchanged. The following workday, Zamora reprimanded Galvan for some performance problems. The next day, he called her into his office where he informed her, in front of the office manager and the new administrator, that he was disappointed with her performance. Zamora then instructed Galvan to relinquish all of her remaining responsibilities and explained that he would take a couple of weeks to determine whether he would continue to employ her. Galvan resigned the following day.

**C**

Six months after Galvan's resignation, Zamora hired Tipton to serve as office manager. Tipton alleges that within the first week of starting her employment, Zamora gave her a hug that involved running his hands up and down her back and pushing his chest and pelvis up against hers. Although Tipton struggled to free herself, Zamora did not release her from his embrace

and whispered that he knew that she would do a good job. On another occasion, Zamora tried to kiss Tipton on the lips. While in daily meetings, Zamora would caress Tipton's hand and smell her hair, noting that it smelled "really good." Zamora would also frequently ask what Tipton intended to wear the next day while biting his lower lip, invite her dancing, call her "chiquita," compliment her body, and tell her that she should wear short skirts.

On one occasion, Zamora informed Tipton she could have anything she wanted, depending on "how loyal and good she was." Another incident involved Zamora urinating in his private bathroom with the door open while Tipton was in his office and reassuring her there was no reason to come back later because he was not going to "do anything." Further, while working late with Tipton, Zamora would inquire whether her husband was a jealous man because, as he explained, Zamora was a handsome man who intimidated others.

On one occasion, Zamora told Tipton to reprimand another female employee. This employee, in turn, reported to Tipton that Zamora had sexually harassed her and that he was issuing the reprimand in retaliation. Tipton investigated these allegations and eventually reported them to Zamora, who denied the allegations and became upset about being confronted, questioning why Tipton took the allegations seriously. Tipton responded that she too felt sexually harassed by him in a similar manner, and at that time Tipton asked the HR manager to record an official sexual harassment complaint.

A few days later, Zamora called Tipton a "sexual harassment spy" at a staff meeting and warned other employees to remember that they were in the presence of an "American woman." According to Tipton, Zamora then assigned her two tasks with impossible deadlines that she failed to complete, resulting in a reprimand. The next day, Zamora told Tipton to take a few days off of work and maybe look for a new job. Zamora then promoted Solis, who was hired two days prior as Zamora's executive secretary, to office manager of one of the clinics.

The next morning, Mrs. Zamora, who was meeting with several female employees who had filed sexual harassment complaints, scheduled a meeting with Tipton. During this meeting, however, Mrs. Zamora told Tipton that Zamora requested that she leave the clinic and that the police were called to escort her. Zamora and Tipton agree that she was effectively fired at this time.

## D

Solis also alleges that during private meetings, Zamora would place his hand over hers and caress it, while telling her not to be afraid. He also often inquired about her boyfriend. On one occasion, Zamora hugged her tightly and kissed her on the lips. Another time, Zamora offered Solis a luxurious apartment, so that he could stay there with her whenever he was in town.

On one occasion, Solis asked to speak to Zamora regarding work-related problems involving another female employee. As Zamora was on his way to South Padre Island, he suggested that Solis drive him there so they could talk on the way. During the trip, Zamora would caress Solis's hand when she placed it on the gear shifter and told her he would cancel plans with his family to be with her. He also asked to stop at her apartment. When Solis said no, Zamora proposed they go to a hotel. Solis again declined and explained that she was only interested in a professional relationship. In response, Zamora inquired why Solis could not be "extra nice" to him like some other female employees, but angrily agreed to treat her as any other employee in the future.

Solis alleged that after this incident, Zamora began unjustifiably reprimanding her. A month later, she was sent to a month-long office manager training at another clinic. Her salary was unchanged. During this training period, Solis was told that Zamora did not want her at the office. On October 17, Zamora eliminated the position of office manager and made Solis a marketing representative, again with salary and benefits unchanged. Considering this a demotion, on October 20, Solis filed a written sexual harassment complaint. The

next day, Zamora fired Solis for allegedly stealing money and pharmaceuticals.

## E

Alaniz and Galvan brought hostile work environment, quid pro quo, and retaliation claims against Zamora. Tipton and Solis later intervened. Alaniz, Tipton, and Solis submitted all three claims to the jury, while Galvan submitted only her quid pro quo claim. The jury found Zamora liable on all claims, awarding past compensatory and punitive damages.[1] Additionally, the jury awarded Alaniz, Tipton, and Solis backpay damages. Zamora now appeals.

## II

Zamora first challenges the district court's denial of his motion for judgment as a matter of law (JMOL) and his motion for a new trial. He asserts that the evidence does not support the verdict as to any of the Appellees' quid pro quo claims nor Tipton's and Solis's hostile work environment claims. Zamora does not challenge the verdict as to the retaliation claims and Alaniz's hostile work environment claim.

"We review the denial of a motion for judgment as a matter of law *de novo* and in accordance with the standards applied by the district court."[2] JMOL is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[3]

We review a district court's denial of a motion for a new trial for abuse of discretion.[4] But, "[o]ur review is particularly limited when the trial court has

---

[1] In accordance with 42 U.S.C. § 1981a(b)(3)(A), because Zamora is a small employer, the court reduced the compensatory and punitive damages awards to conform to statutory caps.

[2] *Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 356 (5th Cir. 2000).

[3] F ED. R. CIV. P. 50(a)(1).

[4] *Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1227 (5th Cir. 1986).

denied a motion for a new trial."[5] Furthermore,

> [i]n such cases, all the factors that govern our review of [the trial court's] decision favor affirmance, and we must affirm the verdict unless the evidence—viewed in the light most favorable to the jury's verdict—points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary [conclusion].[6]

## A

Zamora challenges the sufficiency of evidence supporting Tipton's and Solis's hostile work environment claims. A workplace environment is hostile when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."[7] However, not all harassment, including "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," will affect a "term, condition, or privilege of employment."[8] To be actionable, the working environment must be objectively hostile or abusive.[9] "Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the

---

[5] *Id.*

[6] *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (alterations in original) (internal quotation marks omitted) (quoting *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) and *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 987 (5th Cir. 1989)).

[7] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).

[8] *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (internal citations and quotation marks omitted).

[9] *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).

conduct unreasonably interferes with an employee's work performance."[10]

Given the fact-specific nature of the inquiry, our prior holdings in this context are instructive. In *Shepherd v. Comptroller of Public Accounts*, we determined that the plaintiff could not withstand summary judgment on her hostile work environment claim where a male co-worker (1) told Shepherd that her elbows were the same color as her nipples; (2) told her that she had big thighs while simulating looking under her dress; (3) on several occasions attempted to look down her clothing; (4) often rubbed his hand from her shoulder to her wrist; and (5) twice patted his lap to indicate where she should sit.[11] But, Shepherd also testified that the co-worker never propositioned her or asked her out, and that apart from the above instances the two had a friendly relationship at, as well as outside of, work.[12] Further, the conduct that Shepherd complained of took place over a period of almost two years.[13] We held that this conduct did not rise to the level of a Title VII violation, noting in particular (1) the infrequency of the conduct; (2) that the comments, although "boorish and offensive," were not severe; (3) that Shepherd was never physically threatened; and (4) that the conduct did not interfere unreasonably with work performance.[14]

On the other hand, in *Farpella-Crosby v. Horizon Health Care*, we upheld a jury verdict granting relief on the plaintiff's hostile work environment claim.[15] In *Farpella-Crosby*, the plaintiff's boss made offensive comments two to three

---

[10] *Id.* (citing *Harris*, 510 U.S. at 21-22).

[11] *Shepherd*, 168 F.3d at 872-74.

[12] *Id.* at 872.

[13] *Id.*

[14] *Id.* at 874.

[15] 97 F.3d 803 (5th Cir. 1996).

times a week, often in front of other co-workers.[16] The comments centered around the plaintiff's alleged proclivity to engage in sexual activity.[17] The boss would comment that "he knew what she liked to do" and would often inquire whether she had "got[ten] any" the night before.[18] He also joked that the plaintiff "doesn't know how to use condoms," and in another instance made very crude sexual remarks about the smell emanating from her office.[19] We focused on the frequency and crudeness of the remarks, as well as the frequent inquiries about the plaintiff's sexual activity, and determined that this conduct was sufficiently severe and pervasive to create a hostile work environment, even without evidence of propositioning or inappropriate touching.[20]

In light of these holdings, we conclude that the facts are legally sufficient to support Tipton's and Solis's hostile work environment claims. Unlike in *Shepherd*, Zamora repeatedly asked Tipton out, propositioned her, and commented on her physical appearance and dress. Moreover, this conduct occurred over only 32 days; this frequency of harassment is similar to *Farpella-Crosby*, where comments occurred two to three times a week. Moreover, the record contains evidence of repeated bodily contact.

In regard to Solis, Zamora's harassment was worse than that involved in *Farpella-Crosby* and far worse than that in *Shepherd*. Zamora initiated unwanted and inappropriate contact and directly propositioned Solis on multiple occasions. Accordingly, the district court did not err in denying JMOL or abuse its discretion by denying Zamora a new trial on these claims.

---

[16] *Id.* at 806.

[17] *Id.* at 805.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 806.

**B**

Zamora also challenges the sufficiency of the evidence on all of the Appellees' quid pro quo claims. To establish a Title VII quid pro quo claim, a plaintiff must show that the acceptance or rejection of a supervisor's alleged sexual harassment resulted in a "tangible employment action."[21] "'A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[22] In addition, a plaintiff must show a "causal nexus" between the acceptance or rejection of the sexual advances and the tangible employment action.

This sufficiency claim only has a material effect on the judgment as to Galvan, who asserted only quid pro quo harassment by Zamora. This claim is not supported by sufficient evidence since she has not demonstrated that she suffered a tangible employment action. Even assuming that Galvan did at one time hold the office administrator position, her reassignment to HR manager does not constitute a tangible employment action. Galvan's salary, benefits, and HR duties remained unchanged, and she has not demonstrated that the administrator position was objectively superior so that her reassignment could be considered a demotion.

Zamora's placement of Galvan on a two-week paid probationary period similarly does not rise to the level of tangible employment action. The action was not an "ultimate employment decision,"[23] and it did not result in a

---

[21] *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002).

[22] *Id.* at 481-82 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[23] *See McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)); *see also id.* (concluding that "placing [the employee] on paid leave—whether administrative or sick—was not an adverse employment action").

significant change in benefits. And although Galvan eventually quit because she believed that she would be terminated, there is no evidence that her employment responsibilities were permanently altered prior to her departure.[24]

## C

With respect to Alaniz, Tipton, and Solis, whether legally sufficient evidence supports their quid pro quo claims is irrelevant, because Zamora has not challenged his liability for retaliation, and their claims for sexual harassment are fully supported. Nevertheless, Zamora argues that if we find the evidence insufficient to support the verdict on any of these three Appellees' claims, a new trial on damages would be necessary because the jury was not asked to apportion damages among the different theories of liability. He claims that it is impossible to parse the amount of damages awarded for each claim if certain verdicts are overturned.

Zamora cites cases where a new trial was necessary because we could not tell how the jury ruled on a general verdict encompassing different theories of liability, not because the jury failed to apportion damages among various claims, each framed by a specific interrogatory.[25] In this case, the jury's verdict on each theory of liability was clear. A new trial on damages is not necessary since, irrespective of the quid pro quo claims, the verdict for retaliation constitutes a predicate for backpay and the verdicts for retaliation and harassment support the other damages awards.[26]

---

[24] *See La Day*, 302 F.3d at 482.

[25] *See, e.g.*, *Reeves v. AcroMed Corp.*, 44 F.3d 300, 302-03, 307 (5th Cir. 1995); *Jamison Co., Inc. v. Westvaco Corp.*, 530 F.2d 34, 37 (5th Cir. 1976).

[26] *Zaffuto v. City of Hammond*, 308 F.3d 485, 491 (5th Cir. 2002) (holding that a new trial on compensatory damages was not necessary even though one of the claims was improperly submitted to the jury because the properly submitted claim formed an independent basis to support the award).

## III

Zamora also argues that the district court committed numerous errors that denied him a fair trial by: (1) allowing all four Appellees to present their claims in a single trial; (2) admitting hearsay and "me too" evidence; (3) charging the jury with inconsistent questions; (4) allowing Appellees' attorney to proceed with an improper closing argument; and (5) allowing punitive damages to be awarded partially based on harm allegedly caused to non-litigants.

## A

The district court denied Zamora's motion for separate trials pursuant to Federal Rule of Civil Procedure 42(b). Zamora argues that this resulted in unfair prejudice because it allowed four different plaintiffs with "discrete, unique, individualized and independent" claims to "bolster" each other's cases by presenting irrelevant evidence and unrelated allegations.

A district court's denial of a motion for separate trials is reviewed for abuse of discretion.[27] Rule 42(b) provides that a district court may order separate trials to expedite and economize, for convenience, or to avoid prejudice.[28] Whether to conduct separate trials under the Rule is "a matter left to the sound discretion of the trial court on the basis of circumstances of the litigation before it."[29] While we acknowledge the potential for jury confusion in this case, we conclude that it was outweighed by considerations of judicial economy and that Zamora suffered no real prejudice given the similarities between the cases involved. All of the Appellees' claims center on allegations of

---

[27] *United States v. 449.472 Acres of Land*, 701 F.2d 545, 549-50 (5th Cir. 1983).

[28] FED. R. CIV. P. 42(b).

[29] 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2388 (3d ed. 2008) (collecting cases); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) ("Rule 42(b) merely *allows*, but does not require, a trial court to bifurcate cases in furtherance of convenience or to avoid prejudice." (internal quotation marks omitted)).

continuous sex discrimination involving the same *modus operandi*. Further, Appellees' claims are based on a similar series of transactions that were committed by the same defendant over a relatively short time span. Accordingly, each Appellee's claim and evidence presented was relevant to the others' allegations, while prejudice to the defendant, if any, was minimal. At least one other circuit has held that separate trials were not necessary in similar circumstances.[30] The district court did not abuse its discretion in denying Zamora's Rule 42(b) motion.

## B

### 1

Dovetailing with his previous claim, Zamora argues that the district court's failure to separate the trials allowed Appellees—by testifying about their own circumstances—to subvert Federal Rule of Evidence 404(b), which prohibits the introduction of evidence of other alleged acts of harassment to prove that the plaintiff was also harassed. Zamora also objects to the testimony of two non-party employees, Angelica Ruiz and Mari Adama, on these grounds.

We review a district court's evidentiary rulings for abuse of discretion.[31] The Federal Rules of Evidence do not allow the introduction of "character evidence"—evidence of other "crimes, wrongs, or acts"—"to show action in

---

[30] *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1324-25 (11th Cir. 2000) (affirming the district court's refusal to order separate trials where 18 plaintiffs alleged a systematic pattern of racial discrimination by one particular supervisor, even though the plaintiffs complained of different adverse employment decisions and had different work histories), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003); *cf. EEOC v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998) (affirming the district court's Rule 42 consolidation of claims of two plaintiffs alleging employment discrimination as (1) the cases had common questions of law and fact; (2) both plaintiffs sought to present similar evidence about a climate of racial hostility; (3) the same evidence was relevant to both plaintiffs in establishing why one was fired and why the other perceived a climate of racial discrimination).

[31] *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 168 (5th Cir. 2008).

conformity therewith."[32]  But, evidence of prior bad acts is admissible for other purposes, including proof of intent, plan, motive, knowledge, and absence of mistake or accident.[33]  This rule is equally applicable to discrimination cases.[34]

Evidence that Zamora harassed other parties was admissible for purposes other than "propensity."  At trial, the Appellees' portrayed Zamora as an intimidating boss with a particular *modus operandi* in making sexual overtures to female subordinates.  This evidence is admissible to demonstrate either plan, motive, or absence of mistake.  The testimony of the two non-party employees, Ruiz and Adama, is admissible for similar reasons.

Zamora also objects to the introduction of testimony regarding Silva's harassment.  This evidence was admissible because Zamora was sued in his capacity as an employer and Appellees presented evidence that Zamora continuously ignored complaints of Silva's harassment.  Notably, Zamora does not raise on appeal any issues regarding a possible *Ellerth/Faragher* defense,[35] whether Silva was in fact an employee or supervisor, or sufficiency of notice.

---

[32] FED. R. EVID. 404(b).

[33] *Id.*

[34] *See, e.g.*, *Hitt v. Connell*, 301 F.3d 240, 249-50 (5th Cir. 2002) (holding that evidence of discriminatory firing of third parties was admissible as proof of motive in plaintiff's firing).

[35] If an employer has not taken a tangible employment action against an aggrieved employee, the employer may have an affirmative defense to a claim of vicarious liability for sexual harassment carried out by a supervisor with authority over the employee.  To satisfy the affirmative defense, the employer must show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Zamora asserts that even if this evidence was admissible under Rule 404(b), its admission violates Federal Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice.[36]

The evidence of Zamora's harassment of other parties was highly probative to demonstrating a systemic pattern of discrimination at the clinics and relevant to all Appellees. Accordingly, we cannot say that the district court abused its discretion by weighing the relevant considerations and determining that the probative value of the evidence outweighed any potential of unfair prejudice.[37]

**2**

Zamora also objects to a number of evidentiary rulings on hearsay grounds. For instance, Ricardo Arrioja, a non-party former employee of the HR department, testified to a third-party's account of Silva's harassment. He also testified to allegations of harassment of an unidentified party that he heard from yet another employee. In addition, Appellees provided hearsay testimony about alleged harassment of former employees who did not testify at trial.

Hearsay is not admissible if offered solely for the truth of the matter asserted unless it is defined as non-hearsay or falls within an exception.[38] A number of instances that Zamora complains of, however, do not involve testimony that was offered to prove that Zamora harassed other individuals. Rather, it was offered to demonstrate (1) that other individuals had filed harassment claims through proper channels but that no action was taken, or

---

[36] *See* FED. R. EVID. 403 (providing that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

[37] *See Hitt*, 301 F.3d at 249-50 (determining that the admission of evidence that a supervisor discriminated against third-parties was probative to motive and did not run afoul of FED. R. EVID. 403).

[38] *See* FED. R. EVID. 801-07.

(2) that an employee's decision to investigate a harassment claim caused Zamora to retaliate. These statements were admissible for these purposes.[39]

But, the district court did erroneously admit hearsay testimony—some of which involved multiple layers—on several other occasions. A district court abuses its discretion when it admits evidence based on an error of law.[40] However, because the harmless error doctrine applies, the district court's decision "will be affirmed unless . . . a substantial right of the complaining party was affected."[41] "An error does not affect substantial rights if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict."[42]

After a thorough review of the record, we cannot conclude that the admitted hearsay testimony had more than a slight effect on the jury's verdict. Taken together, the improperly admitted testimony involved allegations of Zamora's harassment of four non-parties who did not testify at trial. However, six other witnesses testified that Zamora had harassed them personally. In addition, a number of witnesses testified to events they observed—and thus had personal knowledge of—corroborating much of the hearsay testimony. Accordingly, the district court's error is not reversible.

---

[39] *See Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 660 (5th Cir. 2002) (holding that testimony of three other complaints of sexual harassment was not hearsay because it was offered to prove that the employer was on notice rather than for the truth of the matter asserted), *abrogation on other grounds recognized by McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007).

[40] *United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003).

[41] *Price v. Rosiek Constr. Co.*, 509 F.3d 704, 707 (5th Cir. 2007) (quoting *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 265 (5th Cir. 2007)).

[42] *Id.* at 707-08 (quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)).

## C

Zamora raises a number of issues related to the submitted jury questions. Because Zamora did not object in district court, we review for plain error.[43] Reversal is appropriate if the error is (1) plain, (2) affects the appellant's substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings.[44] An error is "plain" if it is clear or obvious.[45]

## 1

Zamora asserts that it was plain error to submit both the hostile work environment and the quid pro quo claims to the jury. Zamora relies on *Casiano v. AT&T Corp.*,[46] which he argues clearly stands for the proposition that an employer may not be found liable on both theories of liability. *Casiano*, however, never addressed this question; it merely provided a framework for analyzing whether an employer can avail itself of the *Ellerth/Faragher* defense.[47] In that context, *Casiano* stated that the threshold question is whether the employee suffered a tangible employment action, and based on the answer, the claim is classified as either a hostile work environment or a quid pro quo claim.[48] Then, depending on how the claim is classified, the affirmative defense may or may not be available to the employer.[49] *Casiano* said nothing about whether employers can be held liable on both theories of liability.

We need not resolve this question, particularly since any error in this

---

[43] *See Crawford v. Falcon Drilling Co., Inc.*, 131 F.3d 1120, 1123 (5th Cir. 1997).

[44] *Id.* at 1124.

[45] *Id.* at 1125.

[46] 213 F.3d 278 (5th Cir. 2000).

[47] *Id.* at 283-84.

[48] *Id.* at 283.

[49] *Id.* at 283-84.

regard is harmless. We note merely that the two theories of liability are not wholly inconsistent with one another. Thus, the district court did not commit a clear and obvious error by submitting both questions to the jury.

## 2

Zamora argues that the jury questions relating to the quid pro quo claims and retaliation claims were erroneous because they required the jury to find two "sole causes" of the Appellees' termination. The jury answered "yes" to both:

> Did Plaintiff . . . suffer an adverse employment action as a result of engaging in protected activity under Title VII? (retaliation)

> Did Defendant terminate Plaintiff . . . because she rejected sexual advances, requests, or demands by Dr. Zamora? (quid pro quo).

The retaliation instruction, in turn, stated that the plaintiff must demonstrate that the adverse employment action "would not have occurred 'but for' [the] protected activity." Zamora interprets this instruction as requiring the jury to find the reporting of sexual harassment as the *sole* cause of the termination for retaliation purposes. He then concludes that the jury's answers are inconsistent because it cannot be that the Appellees were terminated solely because of filing a claim, but then also because they rejected Zamora's sexual advances.

Zamora's argument fails because a "but for" cause is simply not synonymous with "sole cause."[50] The district court did not clearly err by submitting both questions and the instruction to the jury, nor is a new trial warranted on the grounds that the jury's answers are inconsistent.

---

[50] *See Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984) ("Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity she would not have been subjected to the action of which she claims.").

**3**

Zamora's third challenge goes to the jury instructions on the basis of the punitive damages award. We do not address this argument because Zamora raised it for the first time in his reply brief.[51]

**D**

Zamora argues that he should be granted a new trial because the opposing counsel's closing argument employed tactics designed to arouse the jury's bias, passion, and prejudice, resulting in a verdict inconsistent with substantial justice. Zamora asserts that opposing counsel appealed to the jury by invoking ethnic bias against Zamora, who is Mexican. For instance, counsel stated that Zamora "wants to benefit financially from the American system and capitalism but does not expect that the laws governing American work places apply to him." Counsel also reminded the jury that Zamora referred to the Appellees as "gringas," stating: "Call us what you want. We'll be the first to admit that we do things differently in the United States." Zamora also argues that counsel's argument inflamed the jury by noting that the Appellees were wives, mothers, and daughters, and that statements such as "[w]e will not tolerate the abuse and intimidation of female employees based upon their sex," amounted to improper "conscience of community" arguments.

Zamora also asserts that counsel improperly argued outside of the scope of the record by stating that Zamora believed that the women he harassed were "asking for it" and by noting the price of Zamora's medical equipment. In addition, Zamora argues that counsel made statements of personal opinion to the jury during closing argument. For example, counsel stated that (1) she could not reconcile the way Zamora was acting; (2) she believed that the evidence presented by Zamora was a "smoke screen" designed to distract the jury from the

---

[51] *See Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989).

truth; and (3) that worry and fear can steal "our hope, expectations and confidence."

Zamora did not object to counsel's closing argument in the trial court. "Our disinclination to review [errors raised for the first time on appeal] is especial when the errors assertedly lie in counsel's closing remarks."[52] "[I]mproper argument may be the basis for a new trial where no objection has been raised only 'where the interest of substantial justice is at stake.'"[53] Absent a timely objection, reversal is generally not warranted based on counsel's improper statements alone.[54] Rather, we consider "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict."[55]

We have found it particularly important whether or not statements made in closing argument were based on evidence in the record; it is a "particularly indefensible tactic" to use "closing arguments to bring before the jury damaging facts not in evidence and never established."[56]  For example, in *Hall v. Freese,* counsel (1) made patently false statements; (2) repeatedly made assertions that the plaintiff's drug-use was a possible cause of her injuries; and (3) painted the plaintiff as a "big-city" resident "who was trying to take advantage of the good people of rural northern Mississippi."[57] We ordered a new trial because, as none

---

[52] *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975).

[53] *Hall v. Freese*, 735 F.2d 956, 961 (5th Cir. 1984) (quoting *Edwards*, 512 F.2d at 286).

[54] *Id.* at 962.

[55] *Mills v. Beech Aircraft Corp., Inc.*, 886 F.2d 758, 765 (5th Cir. 1989).

[56] *Edwards*, 512 F.2d at 284.

[57] 735 F.2d at 960.

of these statements had any basis in the record, we could conclude that they were "made for no reason other than to unfairly prejudice the jury."[58]

By contrast in *Mills v. Beech Aircraft Corporation, Inc.*, we determined that the verdict was not inconsistent with substantial justice even though counsel referred to the other party's expert witness as a "city slicker from Connecticut or California earning more money than any of us ever heard of" and who wanted to "tell these Mississippi folks [about the facts of the accident] and they'll believe me."[59] Counsel also pointed out the opposing party's ability to afford a high priced expert.[60] We distinguished *Hall* by noting that in this case counsel's remarks were "supported by the record and concerned—at least tangentially—the credibility of plaintiffs' experts and their testimony."[61]

Although we do not applaud counsel's statements regarding Zamora's ethnicity, they were sufficiently based on the record and more than tangentially related to Appellees' claims. Specifically, evidence was presented that Zamora made derogatory statements about American women, told his employees that Mexican women habitually sleep with their bosses and that they were smart to do so for purposes of their security, and warned his employees that there was an "American woman spy" present after a harassment complaint was filed. With this evidence, the Appellees sought to demonstrate that Zamora made such ethnic statements in order to denigrate and pressure Appellees to accept his advances and that he justified his behavior by noting these cultural differences.

---

[58] *Id.* at 961; *see also Edwards*, 512 F.2d at 284-85 (holding that the jury's verdict was swayed by passion or prejudice because counsel, in addition to a variety of other improper arguments, falsely stated that a defense witness made a critical admission).

[59] *Mills*, 886 F.2d at 765-66.

[60] *Id.* at 765.

[61] *Id.* at 766.

We disagree with Zamora's contention that counsel's statements regarding Zamora's belief that Appellees wanted his attention and the references to Zamora's medical equipment were based on evidence outside the record. Zamora himself introduced testimony suggesting that Solis would "flaunt" herself to him, while noting her previous employment as a "Bud Light Girl," and personally testified that his equipment was expensive. Moreover, these were isolated statements, unrelated to the general themes of the closing argument.

Finally, Appellees seem to concede the impropriety of counsel's allusion to their roles as mothers and daughters, as well as statements noting what behavior "we" will not tolerate and what "we" lose as victims of sex-based discrimination. But, we agree with the Appellees that these three statements were not an important part of the closing argument. Similarly, counsel's commentary regarding the quality of Zamora's evidence, although inappropriate, neither suggested any special knowledge, nor, viewed in the context of the proceedings as a whole, affected Zamora's opportunity for a fair trial. These statements neither permeated counsel's argument, nor were they so calculated to prejudice the defendant.[62] In light of the entire record and the jury's ultimate verdict, we cannot say that "manifest injustice" has occurred.[63]

**E**

Zamora argues that the jury unconstitutionally considered harm caused to nonparties in imposing punitive damages because the district court admitted evidence of harassment of nonparties and Appellees' counsel stated during closing argument that Zamora should be punished for harm he allegedly caused

---

[62] *Cf. Edwards*, 512 F.2d at 286 (determining that a new trial was warranted where the district court found the jury to be prejudiced and inappropriate remarks "so permeated counsel's argument, and were so calculated to prejudice the defendants").

[63] *Cf. Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998) (noting that a large verdict accompanied with improper appeals to the jury leads to the conclusion that such appeals had an influential impact on the jury's deliberations).

to women who "did not have the courage to stand and face him."

We review the constitutionality of punitive damage awards de novo.[64] "[T]he Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties . . . ."[65] On the other hand, "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible."[66] Thus, a constitutional violation does not occur simply because evidence of harm to nonparties is admitted; the relevant question is whether the jury impermissibly relied on this evidence to reach its punitive damage award.[67] In addition, "the Due Process Clause requires States to provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers"; accordingly, it is "constitutionally important for a court to provide [this assurance]."[68]

The jury instructions and questions clearly indicated that the jury was to assess punitive damages specifically as to each Appellee. The jury, in turn, answered the relevant question for each individual Appellee and awarded a different amount to each. The instructions and the varying awards evidence that the jury understood that the punitive damage awards were supposed to be based on the individual's harm rather than generalized harm to nonparties. Accordingly, Zamora's due process rights were not violated by the jury's award.

*     *     *

---

[64] *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

[65] *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007).

[66] *Id.* at 355.

[67] *See id.*

[68] *Id.*

For the foregoing reasons, we REVERSE the judgment in favor of Galvan, but AFFIRM the judgment in all other respects.