# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 17, 2013

Lyle W. Cayce
Clerk

———————

12-30870

———————

SPYRIDON C. CONTOGOURIS; STEPHEN A. BALDWIN,

Plaintiffs - Appellants,

v.

PACIFIC WEST RESOURCES, L.L.C., formerly known as WestPac Resources, L.L.C.; PATRICK N. SMITH; KEVIN M. COSTNER,

Defendants - Appellees.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:10-CV-4609

---

Before SMITH, PRADO, and ELROD, Circuit Judges.

PER CURIAM:*

This appeal arises from a jury verdict in favor of Defendants–Appellees Pacific West Resources, L.L.C. ("Pacific West"), Patrick Smith, and Kevin Costner in a securities fraud lawsuit brought by Plaintiffs–Appellants Spyridon Contogouris and Stephen Baldwin. Plaintiffs argue on appeal that the district court improperly excluded evidence. Finding no reversible error, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30870

I.

Shortly after the 2010 Deep Water Horizon oil spill in the Gulf of Mexico, Plaintiffs formed a company, Ocean Therapy Solutions ("OTS"), to market oil and water separator machines to BP Exploration and Production, Inc. ("BP"), with the goal that BP would use the separators to clean up the spill. Because of Costner's prior experience in developing the separators, Plaintiffs asked Costner and his business partner, Smith, to join OTS. Costner and Smith did so through their company, Pacific West.

On May 18, 2010, OTS and BP entered into preliminary discussions. Although the two companies did not enter into a lease agreement at that time, BP agreed to test the separators to determine if they could be used in cleaning up the Deep Water Horizon spill. After initial rounds of testing, representatives from OTS (Costner, Smith, and OTS's CEO, John Houghtaling) and BP met again for dinner on June 7 (the "June 7 dinner meeting") to discuss the separators and a potential deal between the companies. Two days later, on June 9, BP and OTS signed a non-binding letter of intent. Final testing of the separators proved successful, and on June 15 BP formally agreed to lease thirty-two separators from OTS for roughly $50 million.

Contemporaneous with OTS's negotiations with BP, tensions developed between the OTS members concerning a "cash call" proposed by OTS CEO Houghtaling and Defendant Smith. According to the terms of the "cash call," each member of OTS would contribute his pro-rata share of $3 million in capital to fund the company or face dilution of his membership interest. Plaintiff Contogouris strongly objected to the proposed cash call, and on June 6 he met with Smith and Houghtaling in a "kiss and make up" meeting to discuss the issue. During this meeting, Smith offered to fund Plaintiffs' portions of the $3 million cash call if they would reduce their OTS membership

2

interests. Contogouris, who essentially acted on behalf of Baldwin, rejected this initial proposal, but ultimately accepted Smith's subsequent offer to purchase Plaintiffs' entire membership interests for $1.9 million. Plaintiffs formally agreed to the deal on June 11.

After selling their membership interests in OTS to Smith, Plaintiffs brought claims for fraud under Louisiana law and § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10(b)–5, alleging that Smith and Costner misled them in connection with the sale.[1] The case proceeded to a jury trial, where Plaintiffs argued that (1) the $3 million "cash call" was a subterfuge to force them out of OTS and that (2) Defendants, at the same time, hid the fact that OTS was on the verge of a highly profitable deal with BP.

To prove that the cash call was a subterfuge, Plaintiffs attempted to show that Costner and Smith had secretly agreed before the cash call not to make capital contributions to OTS; that Smith was secretly negotiating with billionaire investor Ted Skokos about funding OTS; and that no one told them that the BP deal would include a large upfront deposit, which would eliminate the need for the cash call.

To prove that Defendants hid the details of the BP deal, Plaintiffs focused on the June 7 dinner meeting that OTS members Costner, Smith, and Houghtaling held with BP representatives. Contogouris testified that Costner and Smith hid the outcome of the meeting by telling him afterwards that there was no deal with BP. In fact, according to Plaintiffs, Costner and Smith received assurances from BP during the meeting that it would support the separator technology, as shown by actions the parties took afterwards. On

---

[1] In addition to Smith, Costner, and their company, Pacific West, Plaintiffs also sued Rabobank, N.A., which was dismissed from the case for lack of personal jurisdiction.

No. 12-30870

June 8, one day after the dinner meeting, a Pacific West employee sent a text message to a co-worker stating that BP had ordered thirty-two separators, and Smith sent a message to Skokos indicating that the meeting was "amazing."

Plaintiffs also tried to show that Smith mismanaged OTS funds after Plaintiffs left the company. They questioned Smith at trial about his decision to send BP's $18 million advance from its deal with OTS into a newly opened Rabobank bank account. Houghtaling testified that Smith opened the account without his authorization. Skokos, in turn, testified about the unraveling of his relationship with Smith after he learned that Smith had taken funds from OTS, including a $1.045 million loan from Skokos's charitable foundation. According to Skokos's testimony, this information came from an investigation performed by Costner's business advisor, Rod Lake. Plaintiffs also questioned OTS accountant Louis Alvarez, who testified that Lake had discovered a number of expenses that were improperly reimbursed to Smith's company.

Defendants responded by attempting to prove that Plaintiffs were well aware of the details of the BP deal and proceeded to sell their membership interests despite this knowledge. Contogouris admitted to hearing about the BP deal as early as June 10, which was after BP signed the letter of intent but before he and Baldwin agreed to sell their membership interests on June 11. Contogouris subsequently heard about the deal through news outlets and discussed it with Baldwin and others through e-mail correspondence, but did not contact Defendants or otherwise attempt to withdraw from the sale before it closed.[2]

---

[2] Contogouris explained at trial that he did not attempt to withdraw from the sale because he thought he "couldn't turn back on the contract," which the parties signed on June 11.

4

No. 12-30870

Regarding the June 7 dinner meeting, Defendants attempted to show that although BP did not place an order for separators during the meeting,[3] Costner and Smith did not mislead Contogouris into thinking that the meeting was a failure. Contogouris knew that OTS had presented the letter of intent to BP at the meeting, and in response to questioning at trial he admitted that Costner said after the meeting that there was no deal *but* he was hopeful there would be a deal.

Finally, Defendants suggested possible motives as to why Contogouris and Baldwin wanted to sell their membership interests in OTS, despite a pending deal with BP: (1) Contogouris thought BP would file for bankruptcy as a result of the Deep Water Horizon spill; (2) a consultant who was participating in the testing of the separators told Contogouris that the separators were not working as anticipated; and (3) Contogouris had always wanted to part ways with the other members of OTS by buying them out or, in the alternative, selling his membership interest and starting his own oil spill remediation company.

The jury returned a verdict in favor of Defendants on both the federal securities fraud claim and the Louisiana state law fraud claim. Plaintiffs subsequently filed a motion for a new trial, arguing, as they do before us, that on the first day of trial the district court improperly granted Defendants' motion in limine to exclude "bad acts" evidence relating to Smith under Rule 403 of the Federal Rules of Evidence. The district court denied the Plaintiffs' motion for a new trial, explaining that its initial ruling was correct under Rule 403. The court's reasoning was two-fold: As a factual issue, the jury had actually heard evidence relating to some of the "bad acts." As to the remaining

---

[3] BP representatives testified that although they received a draft letter of intent from OTS at the meeting, they did not review it until after the meeting concluded and could not recall placing any orders with OTS for separators until the final contract was signed.

No. 12-30870

"bad acts," the district court explained that the jury had "ample opportunity to assess Smith's credibility" and that

> the probative value of the excluded evidence would have been far outweighed by the danger of unfair prejudice to Patrick Smith. In addition, presentation of such evidence would have wasted time, caused undue delay, and posed a significant rule of confusing the jury. Smith's record of business conduct has been far from admirable. And that conduct which should have been admitted at trial on the issue of his prior bad acts, was admitted.

Plaintiffs timely appealed.

## II.

We review a district court's decision to exclude evidence for abuse of discretion. *MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 117 (5th Cir. 2011). If we find that the district court abused its discretion, "we review the error under the harmless error doctrine, and will affirm the ruling unless it affected substantial rights of the complaining party." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 508 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013) (citation and internal quotation marks omitted).

## III.

Plaintiffs argue that the district court abused its discretion by excluding evidence of a number of Defendant Smith's "bad acts." They argue that this evidence displayed a "systematic campaign of fraud and deceit" and that the district court's decision upended their intended presentation of the evidence. We address each "bad act" in turn.

## A.

We first turn to the gravamen of Plaintiffs' argument, which relates to Smith's alleged theft of a $1.045 million loan made by Skokos's charitable foundation to OTS and of other funds belonging to OTS and Pacific West. On the first day of trial, the district court initially granted Defendants' motion in limine to exclude the evidence of these accusations, along with Smith's other

"bad acts." After Smith testified as to his good character, however, the court altered its ruling on the third day of trial and subsequently allowed Plaintiffs to impeach Smith with the accusations.

Plaintiffs admit that they were allowed to examine Skokos as a witness and to question him about Smith's alleged deceit, but argue that they should have been able, in addition, to show the jury a series of e-mails from Skokos and Lake containing the accusations. These e-mails, which Skokos and Lake sent in late 2010 and early 2011, impugned Smith's character, described Smith's alleged theft of funds from OTS, and essentially demanded that Smith return the funds and relinquish his ownership in OTS. Plaintiffs argue that the district court should have admitted the evidence as proof of Smith's "motive, opportunity, intent, preparation, and plan" to commit fraud, which are listed exceptions to Rule 404(b)'s general prohibition on the admission of a person's crimes, wrongs, and other acts. *See* Fed. R. Evid. 404(b).

To preserve error for appellate review of a ruling to exclude evidence, a party must "inform[] the court of its substance by an offer of proof." Fed. R. Evid. 103(a)(2). Likewise, it is well established in this circuit that "excluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted." *Wright v. Ford Motor Co.*, 508 F.3d 263, 276 (5th Cir. 2007) (quoting *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 387 (5th Cir. 2004)).

Here, the parties discussed the content of the e-mails with the district court as part of a hearing before the district court regarding Smith's credibility as a witness and whether Plaintiffs could use evidence of his "bad acts" to impeach him. Even assuming *arguendo* this discussion constituted an offer of

7

proof,[4] Plaintiffs argue for the first time here on appeal that the evidence was admissible under the listed exceptions to Rule 404(b). At the hearing before the district court, Plaintiffs explicitly disclaimed that a Rule 404(b) exception applied and—after prompting by the district court—confirmed that they sought to use the evidence for impeachment purposes. We therefore review for plain error. *See United States v. Seale*, 600 F.3d 473, 485–88 (5th Cir. 2010) (applying plain error review where a party attempted to rely on a different ground for an objection on appeal); *Wright*, 508 F.3d at 272 (same); *see also* 21 Charles Alan Wright & Kenneth W. Graham, Federal Practice and Procedure § 5040.1, at 895 (2d ed. 2005) ("[W]hen [an evidentiary] objection is sustained, the proponent can only assert on appeal those grounds that were advanced in the trial court.").

Under plain error review, we may only grant relief if an error is "(1) plain, (2) affects the appellant's substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 776 (5th Cir. 2009). "Plain error review in civil cases has always been considered to be an extraordinary remedy for use only in the exceptional case." *Crawford v. Falcon Drilling Co., Inc.*, 131 F.3d 1120, 1133 (5th Cir. 1997). Nothing here even approaches that standard.

Moreover, even if Plaintiffs had argued before the district court that a Rule 404(b) exception applied, any error in refusing to admit the e-mails was harmless, as the accusations in the e-mails were merely cumulative of other evidence presented to the jury. *See, e.g.*, *Sanford v. Johns–Manville Sales Corp.*, 923 F.2d 1142, 1148 (5th Cir. 1991) ("The exclusion of cumulative testimony is harmless."); 11 Charles Alan Wright et al., Federal Practice and

---

[4] *See* Fed. R. Evid. 103(b) ("Once the court rules *definitively on the record*—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (emphasis added)).

No. 12-30870

Procedure § 2885, at 624–27 (2012) (explaining that the exclusion of evidence in a jury case is harmless "if the evidence is of a fact already established by other evidence and thus may be regarded as cumulative"). As the record shows, the jury learned the content of the accusations against Smith through Plaintiffs' examination of Skokos and of Smith himself.

Plaintiffs' counsel questioned Skokos on direct examination about his e-mail communication with Smith, which Skokos recounted in detail.[5] Skokos testified that he discovered that "OTS had paid millions in dividends to Mr. Smith that actually should have been to [him] as a dividend"; that Smith "had misappropriated a couple of million dollars"; and that he told Smith that he "was going straight to the authorities and taking [Smith's] head off and handing it to him." Skokos explained that Lake had discovered Smith's actions by going through company records and bank account information. Likewise, Plaintiffs used the content of perhaps the most damaging e-mail—including direct quotes—when questioning Smith: they questioned him about Skokos's accusations that he committed "outright theft"; that he stole a $1.045 million loan Skokos made to OTS; and that the cash call was "a scam."

In sum, Plaintiffs have not demonstrated how Skokos's allegations in the e-mails would have contributed to their presentation of the evidence beyond what they actually presented, and the jury's verdict "cannot reasonably be attributed to the judge's decision to exclude [them]." *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 363 (5th Cir. 2004). Therefore, their exclusion was harmless.

## B.

We next address Plaintiffs' argument that they were not allowed to

---

[5] It appears from the trial transcript that Skokos had his December 2010 e-mail available to him while testifying. Skokos referenced the e-mail and recited specific dollar amounts listed therein.

No. 12-30870

introduce evidence that Smith allegedly submitted false financial reports to induce an investor to invest in Blue Planet Solutions, a separate company jointly owned by Smith and Costner. The investment, according to Plaintiffs, facilitated the buyout of Houghtaling's membership interest in OTS in July 2010. Along with Smith's other "bad acts," Plaintiffs argue that the district court abused its discretion by excluding this evidence under Rule 403 and that it was admissible under Rule 404(b) as evidence of Smith's "motive, opportunity, intent, preparation, and plan" to commit fraud.

Like the e-mails containing the Skokos allegations, the parties mentioned the Blue Planet allegations only in the context of the hearing with the district court. Even assuming *arguendo* that the colloquy at the hearing constituted an adequate offer of proof, *see* Fed. R. Evid. 103(a)(2), Plaintiffs sought to admit the evidence for the purpose of impeaching Smith and not as one of the listed exceptions to Rule 404(b). Plain error is therefore the proper standard of review for Plaintiffs' unpreserved argument. *See Seale*, 600 F.3d at 485–88. Even so, our resolution of this issue does not turn on the proper standard of review because under the more lenient abuse-of-discretion standard, there was no reversible error.

Rule 403 permits a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "A trial court's ruling on admissibility under Rule 403's balancing test will not be overturned on appeal absent a clear abuse of discretion." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 882 (5th Cir. 2013) (citation and internal quotation marks omitted).

Here, the Blue Planet allegations were at best tangentially probative of what Plaintiffs attempted to show at trial—that Smith and the other

10

No. 12-30870

Defendants misled them by concocting a false "cash call" and by hiding the details of the pending separator leasing contract with BP.  According to Plaintiffs, Smith misled a Blue Planet investor in July 2010, which was after he purchased Plaintiffs' OTS membership interests in June 2010.  Other than a laundry list of asserted purposes, Plaintiffs do not explain how these actions, which allegedly took place after the sale and did not involve them, would have aided them at trial.  Hence, we can only guess as to the probative value of the evidence.

Indeed, its only apparent value was to show that Smith had a propensity to commit fraud, and its introduction may have swayed the jury to conclude that if Smith had lied in his subsequent business dealings, he must have lied in connection with Plaintiffs' sale of their OTS interests.  Rule 404(b) does not permit the introduction of evidence for that purpose alone.  *See* Fed. R. Evid. 404(b); *see also United States v. Stephens*, 571 F.3d 401, 409 (5th Cir. 2009) (explaining the purpose of Rule 404(b)).

C.

We now turn to three of Smith's "bad acts" that, contrary to Plaintiffs' assertions, were in fact presented to the jury.  Plaintiffs argue that they were not allowed to present the following: (1) Smith's allegedly misleading statements in connection with his opening of an unauthorized bank account for OTS at Rabobank; (2) Smith's reimbursement from OTS for allegedly improper expenses; and (3) Smith's alleged default on a $194 million loan in connection with a Snowmass, Colorado, real estate development, which Plaintiffs sought to use as proof of financial motive.  As the record shows, this argument is simply incorrect.

Regarding the Rabobank account, Plaintiffs' brief is inconsistent.  The statements of facts section states that Plaintiffs were unable to present the Rabobank evidence, whereas the argument section admits that the evidence

was in fact admitted. The record corroborates the latter: Plaintiffs questioned Smith extensively at trial about opening the Rabobank account and elicited testimony from OTS CEO John Houghtaling, who testified that Smith opened it without his authority.

Regarding the improper expenses, at trial Plaintiffs examined OTS's accountant, Louis Alvarez, who testified that OTS reimbursed Smith and his company for a number of improper expenses.[6] Indeed, in denying Plaintiffs' motion for a new trial, the district court specifically explained that they were able to present evidence that "Patrick Smith claimed false expenses from OTS. All that was put into evidence." On appeal, Plaintiffs have not attempted to articulate what evidence of improper expenses was disallowed.

Regarding the Colorado real estate loan, the jury heard about Smith's failed real estate developments and other financial pressures from Skokos, who had an ongoing business relationship with Smith. In his testimony, Skokos characterized Smith's real estate developments as "disastrous" and said that the foreclosure of those developments was "front-page news" in Aspen newspapers. Although Skokos did not specifically reference a $194 million dollar amount, he did refer to "that foreclosure in Snowmass" in his testimony.[7]

D.

Finally, Plaintiffs' argument that the district court did not allow them to introduce a January 2011 e-mail from Costner to another OTS member, Franco

---

[6] In connection with Alvarez's testimony, Plaintiffs showed the jury an exhibit listing reimbursement invoices for Smith's company that, according to Alvarez, were improper.

[7] To the extent Plaintiffs argue that they were unable to present other information associated with the loan, we find no reversible error with the district court's decision to exclude what would have been cumulative evidence in light of Skokos's testimony regarding Smith's financial difficulties. *See, e.g.*, *Sanford*, 923 F.2d at 1148 ("The exclusion of cumulative testimony is harmless."). Skokos testified that Smith was "locked down with all of his finances" and that he agreed to loan Smith $15,000 each month for house payments until Smith received a settlement from his recent divorce.

Valobra, in which Costner purportedly said "it's all my fault" in relation to bringing Smith into "the company," also fails. Plaintiffs' brief does not mention any offer of proof and at oral argument Plaintiffs' counsel could not recall one. No offer of proof otherwise appears on the record.[8] *See* Fed. R. Evid. 103(a)(2); *see also Petty v. Ideco, Div. of Dresser Indus., Inc.*, 761 F.2d 1146, 1151 (5th Cir. 1985) ("Where no offer of proof appears of record, there is no way that a party can demonstrate that his substantial rights have been affected."). AFFIRMED.

---

[8] In a conference on the third day of trial, Plaintiffs mentioned in passing that the district court had excluded Costner's e-mail to Valobra. If there was such a ruling, it does not appear on the record. *See Genmoora Corp. v. Moore Bus. Forms, Inc.*, 939 F.2d 1149, 1156 (5th Cir. 1991) ("Without a specific objection and a ruling on the record, we are unable properly to evaluate the trial court's exercise of discretion.").