

# NUMBER 13-23-00166-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TEXAS DEPARTMENT OF
PUBLIC SAFETY,                                                    Appellant,

v.

ROBERT CHRISTOPHER CALLAWAY,                                      Appellee.

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 10
## OF HIDALGO COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Peña**
**Memorandum Opinion by Justice Benavides**

Appellant Robert Christopher Callaway sued his former employer Texas Department of Public Safety (DPS) based on claims of disability discrimination and retaliation. After the parties conducted discovery, DPS filed a plea to the jurisdiction on

no-evidence and traditional summary judgment grounds, which the trial court denied. On interlocutory appeal, DPS maintains that each of Callaway's claims suffers from multiple jurisdictional infirmities. We have organized DPS's arguments into three main sub-issues: failure to state a cognizable claim, failure to exhaust administrative remedies, and merits-based arguments. We affirm in part and reverse and render in part.

## I.    BACKGROUND[1]

Callaway's career with DPS spanned nearly twenty years. He joined in 2004 as a trooper and was promoted to the Criminal Investigations Division (CID) as a special agent in 2010. Two years later, Callaway was selected for the Texas Ranger Division. During his time as a Texas Ranger, Callaway developed a drinking problem.

In 2016, he disclosed his drinking problem to his supervisor Major Brian Burzynski, telling him that he felt "overwhelmed" by the demands of the job. Major Burzynski ordered Callaway to take twelve days off, and when he returned to work, Major Burzynski instructed Callaway to take long weekends to help manage his stress levels. Callaway's condition did not improve. In May 2017, Callaway took leave under the Federal Medical Leave Act (FMLA) to seek "outpatient treatment for alcohol abuse." According to Callaway, Major Burzynski told him that he was "proud" of him for seeking help. Major Burzynski also put Callaway in touch with an FBI agent who was a recovering alcoholic and followed up with Callaway while he was on leave. Despite Major Burzynski's apparent concern for Callaway's wellbeing, Callaway found these actions intrusive.

---

[1] The record in this case is substantial. The parties filed a total of seventy-eight exhibits that collectively span roughly 1,500 pages of the clerk's record. We have limited the background to only those facts that are necessary to our disposition. *See* TEX. R. APP. P. 47.1.

In an affidavit, Callaway alleged that when he returned from FMLA leave in August 2017, he experienced "scrutiny, ridicule, and belittlement" by Major Burzynski. Callaway attributed this mistreatment to his disclosure of his drinking problem. Before taking leave, Callaway was assigned to several specialized groups that investigated crime scenes. Upon returning, Callaway was not restored to these assignments, which carry the potential to earn overtime wages.

Unhappy with his working conditions, Callaway requested a transfer from the Texas Rangers back to CID in 2018. CID Chief Thomas Ruocco approved Callaway's transfer, which became effective on September 1, 2018. As part of that process, Chief Ruocco was informed by Callaway's chain of command in the Rangers Division that Callaway had an alcohol dependency problem and had attended rehabilitation. He was also informed that "Callaway was having some personal issues . . . associated [with] the stress of working alone and with the type of cases [assigned to him]."

On the morning of October 28, 2018, a colleague reported to a supervisor that Callaway smelled of alcohol and "look[ed] a bit out of sorts." By his own admission, Callaway "drank most of a half pint of vodka the previous evening." He was administered a portable breath test (PBT), which showed that he had a low level of detectable alcohol in his system, a violation of DPS policy. Callaway maintained that he had been drinking kombucha tea that morning, which he believed to be the cause of the positive PBT, not the alcohol he consumed the night before. Although it was determined that Callaway should be suspended a day without pay for violating DPS policy, Callaway acknowledged during his deposition that he was never required to serve this suspension.

Around the same time, DPS conducted another investigation into an allegation that Callaway improperly contacted a murder victim's family member while off duty. At the end of the investigation, Chief Ruocco concluded that Callaway had not violated DPS policy, and consequently, Callaway was not disciplined.

On February 1, 2019, Callaway's legal counsel sent a letter of representation (LOR) to DPS alleging that DPS violated Callaway's rights under the Americans with Disabilities Act (ADA) and FMLA and requesting an investigation. The LOR specifically alleged that Callaway's "Major routinely created a hostile work environment" after Callaway returned from medical leave. This prompted an internal investigation by DPS's Office of Inspector General (OIG). Callaway submitted an affidavit to OIG alleging that Major Burzynski had mistreated him after Callaway disclosed his "problem with alcohol abuse." Deputy Inspector General James Lopez subsequently notified Callaway that "[a] thorough investigation" into his discrimination claims "failed to reveal any evidence of policy violation by Major Burzynski."

Callaway filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) that was signed and dated by Callaway on March 28, 2019, and received by the EEOC on April 8, 2019. In the charge, Callaway checked the boxes for disability discrimination and retaliation, alleged that the discrimination occurred from May 17, 2016, until March 16, 2019, and indicated that the discrimination was part of a "CONTINUING ACTION." Callaway also provided the following narrative, which mirrored the allegations made in the prior LOR:

> **Statement of Harm:** I suffer from a medical condition, of which TxDPS is aware. Specifically, I am a recovering alcoholic and deal with PTSD. I

4

applied and was approved for medical leave to treat my condition. Prior to taking leave, I requested help from TxDPS, but no one offered guidance or support. When I returned, I was retaliated against by my Major and he routinely created a hostile work environment. I complained; however, no remedial action was taken. Thereafter, I was placed on suspension after testing came back positive for low traces of alcohol that was due to the probiotic drink I was drinking. TxDPS created a pretext to effectuate my termination by testing me and subsequently placing me on a 90[-]day suspension.

**Statement of Discrimination:** I believe I have been discriminated against because of my disability, in violation of the Americans with Disabilities Act (ADA).

While the EEOC's investigation was pending, Callaway was involved in an off-duty incident that occurred at his daughter's school on January 15, 2020. On October 12, 2020, DPS notified Callaway that he was being terminated because of his conduct during this incident. Callaway amended his administrative complaint on October 17, 2020, raising new allegations of discrimination and retaliation related to his termination. The EEOC made a "no cause" finding and issued Callaway a right-to-sue letter on November 5, 2020.

The January 15, 2020 incident began when Callaway's wife was notified by school counselor Graciela Valdez that their daughter had expressed suicidal ideations and would be involuntarily admitted to a behavioral hospital for observation and treatment under "Section 26." At the time, Callaway was on FMLA leave for a second time and had recently completed inpatient treatment for alcohol addiction and post-traumatic stress disorder (PTSD). He and his wife drove to the school to attend to their daughter and speak with Valdez.

The Callaways initially disagreed with the decision to have their daughter involuntarily admitted and questioned the school's authority to act contrary to their wishes

as parents. They believed that the better course of action was to take their daughter home and then take her for counseling the following day. Officer Alex Mota and Corporal Luis Olivarez, both with the school district's police department, insisted that they were required to have the daughter involuntarily admitted based on the results of her suicide risk assessment, which had been administered by Valdez.[2] Valdez explained to the Callaways how the assessment worked and some of the responses provided by their daughter. The Callaways disagreed that these responses indicated that there was an immediate and significant risk that their daughter would commit suicide if not admitted to a hospital. At this point, with school officials unwilling to relent, Callaway attempted to use his position with DPS to influence Officer Mota and Corporal Olivarez into changing their minds. His conduct would become the subject of a criminal investigation by the school district's police department.

The incident, which occurred inside Valdez's office, was captured by Corporal Olivarez's and Officer Mota's body-worn cameras. According to the police report of one investigator who reviewed the videos,[3] "Callaway stood up and took out what appeared to be a police badge and put it around his neck." After ordering Corporal Olivarez to "get out of his office," Callaway "pulled out a pair of handcuffs" and said, "Let's see who has the bigger handcuffs." He also reportedly told Corporal Olivarez and Officer Mota that "he

---

[2] A police officer may take a person into custody without a warrant if the officer believes: (1) the person is suffering from a mental illness; (2) it is necessary to take the person into custody to prevent a substantial risk of harm to the person; and (3) there is insufficient time to obtain a warrant before taking the person into custody. TEX. HEALTH & SAFETY CODE ANN. § 573.001(a). The officer is then required to immediately take the apprehended person to "the nearest appropriate mental health facility." *Id.* § 573.001(d)(1)(A).

[3] The videos are not part of the record.

6

had jurisdiction over the school campus" and asked them "if they wanted to be arrested." To diffuse the situation, Corporal Olivarez and Officer Mota agreed to leave the office so that Callaway could speak to his daughter. "As Corporal Olivarez was stepping outside, Mr. Callaway closed the door causing it to hit Corporal Olivarez on the left foot." These events were corroborated by Officer Mota, another investigator who also reviewed the videos, and Valdez, who provided an affidavit to investigators.

At one point, Valdez's office phone rang, and according to the first investigator, "Callaway instructed Ms. Valdez to put the phone down and she complied." Officer Mota provided a similar account, saying that "Callaway ordered her in a forceful tone to put her phone down." According to Valdez's affidavit, Callaway told her, "DO NOT ANSWER THAT!" Valdez said she "felt trapped and feared for [her] safety and [her] life." She continued, "I was not sure how he would react after witnessing such a display of aggression. After 40 years as an educator[,] I have never been so afraid." Another school counselor who witnessed some of the events had a similar reaction: "In my 15 years in education[,] I can honestly say I have never felt so threatened by a parent's behavior and attitude towards our process of keeping our students safe."

At the urging of Callaway's wife, the couple eventually agreed to have their daughter admitted. Callaway immediately apologized to the two officers for his conduct. He also subsequently sent a letter of apology to a supervisor at the school district's police department.

At the end of its investigation, the school district's police department concluded that Callaway committed three criminal offenses that day: official oppression, interference

7

with public duties, and abuse of official capacity. The department presented the case to the local district attorney's office, which declined to prosecute Callaway.

The incident also led to an internal investigation by OIG. As part of the investigation, Callaway provided OIG with an affidavit explaining his version of events. He recounted how he had recently received inpatient treatment for "alcohol abuse, anxiety/depression, and post-traumatic stress." Callaway said that, during treatment, he "discovered that [he] stay[s] in an elevated state of hypervigilance and awareness: fight or flight." He attributed this "excited state" to "repeated exposure to trauma" and said that he failed to engage in "proper prevention" on the day of the incident. Callaway admitted that he violated DPS policy by being discourteous and unprofessional, but he denied that he violated any laws or other DPS policies.

OIG issued a report finding that Callaway violated several DPS policies. Those findings were reviewed by Callaway's chain of command, and each of these supervisors sustained the findings and made their own discipline recommendations. DPS uses a disciplinary matrix that places policy violations in different categories of presumptive discipline. An employee's discipline can be adjusted downward or upward depending on the existence of mitigating or aggravating circumstances. DPS's general manual provides a non-exclusive list of possible mitigating factors, including a consideration of the circumstances under which the rule was violated, and a willingness to accept responsibility and acknowledge wrongdoing. The matrix describes Category D violations as "[c]onduct in violation of law or policy that involves the serious abuse or misuse of authority, unethical behavior[,] or that causes a serious and adverse impact on either

public safety or customer service." The presumptive penalty for a Category D violation is a suspension for five to ten days but can be enhanced to a thirty-day suspension or termination depending on the existence of aggravating factors. A Category E violation is the most serious type of violation and is described in pertinent part as conduct that "constitutes a disregard of the core values of the Department . . . [or] demonstrates a serious lack of integrity related to the fitness to hold a position in a law enforcement agency." The presumptive penalty for a Category E violation is termination, and the mitigated penalty is a thirty-day suspension. In this case, it was determined that Callaway's conduct fell in Category E.

CID Assistant Chief Wynn Reynolds recommended that Callaway's punishment be adjusted downward to a thirty-day suspension without pay because there were mitigating factors. DPS's Office of General Counsel (OGC) reviewed the recommended discipline and agreed that it was "consistent with the investigation." However, Chief Ruocco disagreed that there were mitigating factors and recommended termination.

During a post-suit deposition, Chief Ruocco acknowledged that, prior to Callaway's termination, he was generally aware that Callaway had filed an internal discrimination complaint and charge with the EEOC. He denied, however, that he knew Callaway was alleging disability discrimination based on PTSD and alcoholism: "I was aware that he had an issue with his time at the Rangers and was citing something, but I never got into the details or the weeds of it."

Chief Ruocco confirmed that, prior to the January 15, 2020 incident, Callaway was not in danger of losing his job. He also confirmed that there was no allegation that

Callaway had been consuming alcohol prior to the incident. Chief Ruocco said that he reviewed OIG's "entire investigative file" and met with Assistant Chief Reynolds to discuss Reynolds's recommendation to suspend Callaway for thirty days. Chief Ruocco determined that Callaway's actions on that day and his explanation afterwards called into question Callaway's "fitness for duty." Chief Ruocco explained that, in addition to Callaway's behavior, his concern about Callaway's "mental health" was a deciding factor in recommending termination. He pointed to Callaway's explanation about sometimes being in a hypervigilant state and opined that Callaway was incapable of controlling his emotions. Chief Ruocco said that he "locked in on that" when making his termination recommendation. He also believed that Callaway "disassociated himself [from] the situation" because he ordered Officer Mota and Corporal Olivarez out of "his" office, even though they were in the counselor's office. Chief Ruocco expressed fear about the potential consequences if Callaway were to lose control of his emotions again: "I mean, we're giving this guy a badge and a gun[,] and he seems to not be totally in control of his emotions at certain times . . . ."

Chief Ruocco's recommendation for termination stated that there were "no mitigating factors." However, Chief Ruocco admitted during his deposition that, based on the guidelines in DPS's general manual, there were mitigating circumstances that applied in Callaway's case; namely, that Callaway accepted responsibility and acknowledged wrongdoing, and the fact that the situation involved his daughter. In explaining this discrepancy, Chief Ruocco said that what he intended to write in his recommendation was that "there were no mitigating factors that were sufficient to bring it down from the

10

presumptive penalty." Chief Ruocco's recommendation also stated that Callaway had been "charged" with three criminal offenses. Chief Ruocco also acknowledged during his deposition that Callaway was not actually charged with these offenses because there was no information filed against him and the district attorney's office declined to prosecute the case.

During a pre-suit administrative hearing in which Callaway contested his termination before the Public Safety Commission of Texas, Chief Ruocco testified that DPS had treatment programs for officers in distress that could be recommended as an alternative to termination. He acknowledged that Assistant Chief Reynolds made this recommendation for Callaway. But contrary to his subsequent deposition testimony, Chief Ruocco stated that he did not consider Callaway's mental health in recommending his termination: "But I had to look at the performance. And if there was a personal issue that needs to be assessed medically, then that situation should come into play in the process, and it would go down that road. But I was looking at the actions only."

Chief Ruocco's recommendation was first sent to Deputy Director Randy Prince, who concurred with the termination recommendation. Director Steven McCraw was the final decisionmaker on all DPS terminations during the relevant period, and it was Director McCraw that "made the final decision to fire Callaway." During his time heading CID, Chief Ruocco recommended termination approximately ten times, but he could only recall one instance in which Director McCraw did not concur with his recommendation. In a subsequent affidavit filed in support of DPS's summary judgment motion, Chief Ruocco said that he was unaware that Callaway had PTSD when he made his recommendation

11

for termination. Director McCraw accepted the recommendation for termination.

As previously mentioned, Callaway appealed his termination to the Public Safety Commission of Texas. Director McCraw testified at the hearing and confirmed that it is his responsibility to review recommendations for termination. He said that he reviews the "totality of circumstances" in each case before reaching a final decision on whether to terminate, noting that "each one is different." In Callaway's case, Director McCraw considered the sensitive nature of the situation because it involved Callaway's daughter, as well as character references submitted by Callaway, but he ultimately found that Callaway's conduct warranted termination, saying "[i]t was a clear call." For Director McCraw, it went beyond merely being unprofessional; the tipping point was the fact that Callaway used his "position as a DPS special agent to . . . interfere with the official response of police in another police agency." Director McCraw further explained that "a DPS Officer has an obligation to control their emotions" and Callaway had failed in that regard. Director McCraw also expressed concern about the possible consequences of retaining Callaway given Callaway's explanation for his conduct: "[U]nfortunately, we can't afford to have a trooper, a special agent, or Texas Ranger that can't control their emotions and [who is] someone seeking thrill or has to be driven by a thrill."

On cross-examination, Director McCraw was asked about six other DPS officers in various divisions, including CID, who recently violated DPS policies but were only suspended rather than terminated. For each officer, Callaway's counsel provided a brief synopsis of the officer's conduct and asked Director McCraw to confirm that each employee was only suspended for a few days. For instance, one officer received a five-

day suspension after it was determined that he used his position with DPS to solicit a discount on a vehicle towing fee and then threatened a member of the public when he did not receive the discount. In another example, an off-duty officer received a five-day suspension after he got impatient and drove through an ongoing parade, initially refused a sheriff deputy's directive to pull over, and then got into a physical altercation with the arresting officer that resulted in criminal charges for resisting arrest. In a third example, an officer was suspended for four days after he tased one officer and pointed a pistol at another officer. In a fourth example, an off-duty officer interfered with a sheriff's deputy who was attempting to perform his official duties by intentionally disabling a vehicle being seized by the deputy. Director McCraw generally acknowledged these incidents and the punishments assessed but maintained that "each one of those were not at the level of termination." He could not recall if he was aware that Callaway had previously filed complaints about discrimination when he made his decision to terminate Callaway. But he denied that such knowledge would have influenced his decision, saying that it was Callaway's right to make those complaints, and his "decision was based on the totality of circumstances o[f] [Callaway's] unique situation and solely on that." The Public Safety Commission of Texas affirmed Callaway's termination.

Callaway filed suit on January 29, 2021, and subsequently filed two amended petitions. In each iteration, including his live pleading, Callaway expressly disclaimed that he was asserting any federal claims against DPS. Instead, he alleged that he was exclusively suing under the Texas Commission on Human Rights Act (TCHRA) for disability discrimination and retaliation. He identified his disabilities as alcoholism and

13

PTSD. In support of his claims, Callaway generally alleged that, after disclosing his disabilities to DPS, he was subjected to a hostile work environment and that DPS failed to accommodate his disabilities. He further alleged that his termination was motivated by discriminatory and retaliatory animus.

During his deposition, Callaway acknowledged that his conduct at his daughter's school violated DPS policy and that he should have been disciplined for it. He said that he would have accepted any discipline other than termination, including a suspension without pay. He agreed that the amount of discipline administered in his case was "a judgment call," but he believed that his termination was unjustified. When asked to explain why, Callaway said that he had acknowledged his mistakes and apologized to the officers involved in the incident, which should have been mitigating factors in his discipline. When asked why he believed he was discriminated against, Callaway alleged that Chief Ruocco had made statements like, "We need—we need to get rid of this guy. We don't like his admission of his substance abuse problem. We don't like the fact that he's talking openly about those problems in law enforcement circles." Callaway acknowledged that the decision to terminate him was reviewed at different levels of his chain of command but said, "I find it hard to believe that the initial recommendation was changed to termination just on a whim. I don't—I find it hard to believe that that happened just because, you know, my behavior was so egregious that day." As for his retaliation claim, Callaway admitted that he had "[n]o direct evidence" that his termination was motivated by retaliation.

DPS filed its plea to the jurisdiction on no-evidence and traditional summary

judgment grounds, raising many of the same arguments it presents on appeal. After a hearing, the trial court denied the plea, and this interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8).

## II.  STANDARD OF REVIEW & APPLICABLE LAW

Subject matter jurisdiction is essential to a court's authority to decide a case. *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (per curiam) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). Whether a trial court has subject matter jurisdiction over a plaintiff's claim is generally a question of law we review de novo. *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016).

A common-law doctrine, sovereign immunity protects the State and its agencies, like DPS, from suits for money damages and deprives a trial court of subject matter jurisdiction over the plaintiff's claims. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008) (*Garcia I*). This protection includes immunity from suit unless the Legislature has expressly waived immunity for the type of claim asserted. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). "A plaintiff has the burden to affirmatively demonstrate the trial court's jurisdiction." *Town of Shady Shore v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012)). Accordingly, when a plaintiff sues a governmental entity, they must allege facts that fall within a legislative waiver of immunity. *Id.* (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)). A governmental defendant may challenge the trial court's jurisdiction by attacking the plaintiff's pleadings, the existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544

15

S.W.3d 755, 770 (Tex. 2018).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). When a plea to the jurisdiction challenges the plaintiff's pleadings, we construe the pleadings liberally and look to the plaintiff's intent. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). If the pleadings are deficient but do not demonstrate an incurable defect, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend their pleadings. *Id.* at 226–27. Conversely, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 226.

When a governmental defendant challenges the existence of jurisdictional facts and supports its argument with evidence, "the standard of review mirrors that of a traditional summary judgment." *Town of Shady Shores*, 590 S.W.3d at 550 (citing *Miranda*, 133 S.W.3d at 228). If the governmental entity's evidence establishes the absence of a jurisdictional fact, the burden shifts to the plaintiff to raise a genuine issue of material fact for the jury to resolve; if the plaintiff fails in that regard, the trial court should rule on the jurisdictional question as a matter of law. *Miranda*, 133 S.W.3d at 228. "[I]n evaluating the parties' evidence, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528–29 (Tex. 2022) (citing *Miranda*, 133 S.W.3d at 228).

After an adequate time for discovery, a governmental entity may also challenge the existence of jurisdictional facts through a no-evidence motion for summary judgment. *Town of Shady Shores*, 590 S.W.3d at 551. The governmental entity must first identify an element of a claim for which there is no evidence. *Id.* (citing TEX. R. CIV. P. 166a(i)). It is then incumbent upon the plaintiff to create a genuine issue of material fact by producing "more than a scintilla of evidence establishing the existence of the challenged element." *Id.* (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)). As with a jurisdictional challenge on traditional summary judgment grounds, we view the evidence in the light most favorable to the plaintiff. *Id.*

The TCHRA prohibits employers from discriminating against employees based on "race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE ANN. § 21.051. The TCHRA also prohibits employers from retaliating against employees for engaging in certain protected activities, such as reporting discrimination internally or filing a charge of discrimination with the Texas Workforce Commission or EEOC. *Id.* § 21.055.

"The TCHRA waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute." *Alamo Heights*, 544 S.W.3d at 770; *see* TEX. LAB. CODE ANN. § 21.254 (permitting an employee to "bring a civil action against" their employer). A plaintiff who fails to allege a viable claim under the TCHRA is subject to dismissal for want of jurisdiction. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 637 (Tex. 2012) (*Garcia II*). Likewise, once a claim under the TCHRA fails on evidentiary grounds, the alleged waiver evaporates, and the trial court should dismiss the claim for want of jurisdiction. *Alamo Heights*, 544 S.W.3d at 763 ("By intertwining the TCHRA's immunity

17

waiver with the merits of a statutory claim, the Legislature ensures public funds are not expended defending claims lacking sufficient evidence to allow reasonable jurors to find the governmental entity liable."). Because the TCHRA was modeled after Title VII of the Civil Rights Act of 1964 and Title I of the ADA, *see* TEX. LAB. CODE ANN. § 21.001(1), (3), Texas courts are guided by federal precedent to the extent that the TCHRA and those federal statutes are analogous. *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (citing *Garcia II*, 372 S.W.3d at 634).

Violations of the TCHRA can be established with either direct or circumstantial evidence, and for cases based on circumstantial evidence, Texas courts employ the three-part *McDonnell Douglas* burden-shifting framework. *Alamo Heights*, 544 S.W.3d at 781–82 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)). First, the employee must establish a prima facie case, which gives rise to a rebuttable presumption that a statutory violation occurred. *Id.* at 782 (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–54 (1981)). "Although the precise elements of this showing will vary depending on the allegations, . . . the plaintiff's burden at this stage of the case 'is not onerous.'" *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001) (quoting *Burdine*, 450 U.S. at 253). The employer may then rebut this presumption by offering a legitimate, nondiscriminatory reason for the disputed employment action. *Alamo Heights*, 544 S.W.3d at 781–82 (citing *Burdine*, 450 U.S. at 254–55). This is a burden of production, not persuasion, and involves no credibility assessment. *Reeves v. Anderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "Once rebutted, the presumption disappears, and an

employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Alamo Heights*, 544 S.W.3d at 782 (citing *Burdine*, 450 U.S. at 255–56).

For claims against government employers, each step of the *McDonnell Douglas* analysis is jurisdictional in nature. *Id.* at 783. Thus, "[f]or a plaintiff who proceeds along the *McDonnell Douglas* burden-shifting framework, the prima facie case is the necessary first step to bringing a discrimination claim under the TCHRA." *Garcia II*, 372 S.W.3d at 637. A plaintiff's failure to make a prima facie case "means the plaintiff never gets the presumption of discrimination," and the claim should be dismissed because the trial court lacks jurisdiction. *Id.*

However, when direct evidence of discrimination or retaliation exists, the *McDonnell Douglass* burden-shifting framework is not implicated. *Democratic Schs. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 308 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Garcia II*, 372 S.W.3d at 634). "Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Id.* at 307 (quoting *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)). "In both direct- and circumstantial-evidence cases, the burden of persuasion remains at all times with the employee." *Alamo Heights*, 544 S.W.3d at 782 (citing *Burdine*, 450 U.S. at 253).

### III.    ALCOHOLISM IS NOT A DISABILITY UNDER THE TCHRA

We begin with what we construe as a jurisdictional challenge to Callaway's pleading. Callaway alleges in his petition that his alcoholism is a protected disability under

19

the TCHRA and that DPS discriminated against him based on this disability by creating a hostile work environment, failing to make reasonable accommodations, and ultimately terminating him. DPS contends that the TCHRA expressly excludes alcoholism as a covered disability, and therefore, Callaway's discrimination claims based on alcoholism are facially invalid. Callaway responds that "[a]lcohol dependency has long been identified as a potential disability under the ADA" and that he provided "ample evidence of his impairment due to his alcohol dependency." He also acknowledges in his brief that his alcoholism affected him "for years and still did as of the date of his termination."

To establish a prima facie case of disability discrimination, a plaintiff must show: (1) he has a disability; (2) he was qualified for the job; and (3) he suffered an adverse employment action because of his disability. *Lara*, 625 S.W.3d at 61; *County of El Paso v. Flores*, 677 S.W.3d 31, 44 (Tex. App.—El Paso 2023, pet. denied); *see* Tex. Lab. Code Ann. § 21.051. The THRCA defines "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab. Code Ann. § 21.002(6). The definition does not include "a current condition of addiction to the use of alcohol, a drug, an illegal substance, or a federally controlled substance." *Id.* § 21.002(6)(A). The ADA, on the other hand, has no similar exclusion, and a person with alcoholism may qualify as an individual with a disability under the ADA if the effects of their alcohol dependency meet the general definition of disability. *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 483 (5th Cir. 2023) (reversing summary judgment in favor of employer because employee raised a genuine issue of material fact as to whether his

alcoholism qualified as a disability).

Although the TCHRA requires that the term disability be construed "in favor of broad coverage of individuals" and "to the maximum extent allowed," *see* TEX. LAB. CODE ANN. § 21.0021(a)(1), Callaway's various discrimination claims based on his alcoholism are not cognizable under the TCHRA. *See id.* § 21.002(6)(A); *Lottinger v. Shell Oil Co.*, 143 F. Supp. 2d 753, 756 (S.D. Tex. 2001) ("It is undisputed that during the relevant time period, Lottinger was alcohol dependent. Hence, he does not qualify as a disabled individual within the meaning of the TCHRA on the basis of his alcoholism."), *overruled on other grounds by In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 310 (Tex. 2010) (orig. proceeding); *Melendez v. Hous. Indep. Sch. Dist.*, 418 S.W.3d 701, 708 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (finding opiate addiction did not qualify as a disability under same exception). This is true even if DPS regarded Callaway's alcoholism as a disability, as he alleges in his petition. *See* TEX. LAB. CODE ANN. § 21.002(6)(A). Consequently, Callaway has failed to allege a viable waiver of immunity for his disability discrimination claims under the TCHRA based on his alcoholism. *See Alamo Heights*, 544 S.W.3d at 770.

Callaway's reliance on the ADA and federal precedent is misplaced because he has not asserted a claim under the ADA, choosing instead to bring his claims exclusively under the TCHRA. In fact, he expressly disclaimed that he was asserting any federal claims against DPS. Moreover, because the TCHRA and ADA diverge on whether alcoholism is a disability, we defer to Texas law. *See Lara*, 625 S.W.3d at 52. We sustain DPS's first sub-issue and proceed to address Callaway's retaliation claims and disability

discrimination claims based on his PTSD.

### IV. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

DPS next argues that Callaway failed to properly exhaust his administrative remedies with respect to certain claims. Specifically, DPS contends that Callaway's claims for hostile work environment, failure to accommodate, and lost overtime are all based on incidents that occurred more than 180 days before Callaway filed his charge with the EEOC. Additionally, DPS argues that Callaway omitted his failure to accommodate and lost overtime claims from his charge.[4] Finally, DPS contends that Callaway's attempt to amend his charge to include his termination-based claims was legally ineffective.

### A. Applicable Law

Before a plaintiff can maintain a suit for employment discrimination under the TCHRA, the plaintiff first must file a complaint of employment discrimination with the TWC's civil rights division or with the EEOC. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 502–03 (Tex. 2012); *see* TEX. LAB. CODE ANN. § 21.201. The complaint "must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred." TEX. LAB. CODE ANN. § 21.202(a). Failure to file an administrative complaint within the 180-day window constitutes a jurisdictional bar to suit. *Chatha*, 381 S.W.3d at 514 (citing TEX. GOV'T CODE ANN. § 311.034). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed

---

[4] We note that there is no allegation in Callaway's live petition that he was denied overtime because of his disability or as retaliation for engaging in a protected activity. It appears that DPS has included this allegation because Callaway discussed it in an affidavit and during his deposition.

charges. Each discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* at 115 (citation omitted). "A workplace environment is hostile when it is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Because a hostile-work-environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,' it does not matter that some of the component acts of the hostile work environment fall outside the statutory time period." *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 324 (Tex. App.—Texarkana 2008, pet. denied) (quoting *Morgan*, 536 U.S. at 117). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. "Termination does not qualify as a predicate act supporting the hostile-work-environment claim; termination is not itself harassing conduct." *Bartosh*, 259 S.W.3d at 324–25 (citing *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000)). Likewise, "[w]hen an employer denies its employee a reasonable accommodation, it is considered a discrete discriminatory act." *Smithson v. Union Pac. R.R. Co.*, 602 F. Supp. 3d 974, 981 (W.D. Tex. 2022) (citing *Henson v. Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 391 (5th Cir. 2005)). Finally, the denial of an employment benefit such as overtime is also a discrete claim subject to

23

the 180-day filing requirement. *See Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 349 (5th Cir. 2010).

The Texas Labor Code allows a claimant to amend a charge of discrimination to "cure technical defects or omissions . . . or to clarify and amplify" the initial allegations. TEX. LAB. CODE ANN. § 21.201(e). "An amendment to a complaint alleging additional facts that constitute unlawful employment practices relating to or arising from the subject matter of the original complaint relates back to the date the complaint was first received by the commission." *Id.* § 21.201(f). "Generally, amendments that raise a new legal theory do not 'relate back' to an original charge of discrimination." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 878 (5th Cir. 2003) (collecting cases). For instance, the Fifth Circuit Court of Appeals found that an amended charge raising racial discrimination did not relate back to "the allegations of sex discrimination advanced in the original charge." *EEOC v. Miss. Coll.*, 626 F.2d 477, 483 (5th Cir. 1980). When new discrete acts of discrimination occur after the original charge is filed, the complainant has two options to satisfy the exhaustion requirement: they may file a new administrative complaint within 180 days of the incident, or they may supplement or amend the original charge. *See Simmons-Myers v. Caesars Ent. Corp.*, 515 F. App'x 269, 273 (5th Cir. 2013) (citing *Morgan*, 536 U.S. at 114); *Wernert v. City of Dublin*, 557 S.W.3d 868, 875 (Tex. App.—Eastland 2018, no pet.) ("For the reasons expressed in *Simmons-Myers*, we agree with the City's position that Wernert's claims are precluded because he did not file an [amended or new] administrative charge for these discrete acts that occurred after his previous EEOC charge.").

24

**B.      Original Charge**

Callaway filed his initial charge on April 8, 2019, meaning any discriminatory acts that occurred before October 10, 2018, are time barred and the trial court lacks subject matter jurisdiction over those claims. *See* TEX. LAB. CODE ANN. § 21.202(a); *Chatha*, 381 S.W.3d at 514; *Morgan*, 536 U.S. at 113. We conclude that Callaway's claims for hostile work environment, failure to accommodate, and lost overtime all occurred before October 10, 2018, and were therefore untimely.

From the beginning, Callaway has consistently alleged that the hostile work environment he allegedly experienced occurred while he was a Texas Ranger and that the person chiefly responsible for his mistreatment was Major Burzynski. These allegations were made in the LOR, Callaway's affidavit in support of his internal complaint, his original charge of discrimination, his petition, and his deposition. For instance, Callaway alleges in his petition that when he returned from FMLA leave, he "was continually subjected to harassment and abusive treatment from Major Burzynski which was entirely related to [his] disabilities and request for FMLA leave." This accusation tracks his original charge in which he also alleged that his "Major . . . routinely created a hostile work environment" after he returned from leave. Finally, during his deposition, Callaway again pointed to Major Burzynski as his alleged tormentor, saying the major unfairly criticized his work performance and was verbally abusive towards him.[5]

It is undisputed, however, that Callaway transferred from the Texas Rangers back

---

[5] DPS alternatively argues that the alleged mistreatment Callaway describes does not rise to the level of a hostile work environment as a matter of law. Given our disposition, we do not reach this alternative argument. *See* TEX. R. APP. P. 47.1.

to CID on September 1, 2018. Although Callaway complains about adverse employment actions that occurred after his transfer, these discrete acts, such as his termination, are not part of his hostile work environment claim. *See Bartosh*, 259 S.W.3d at 324–25; *Morgan*, 536 U.S. at 113. Indeed, Callaway stated in his supporting affidavit to OIG that after transferring to CID, his "chain-of-command conducted business in a professional and dignified manner. . . . Not once was I made to feel humiliated, belittled, criticized, looked down on, or judged for what happened or anything in the past. I have received encouragement, hope for a positive future, and prayers for peace and healing." Consequently, "the entire time period of the [alleged] hostile environment" falls outside Callaway's 180-day window for filing a timely complaint. *See Morgan*, 536 U.S. at 117.

Callaway's discrete claims for failure to accommodate and lost overtime also occurred while he was a Texas Ranger and are therefore untimely. As part of the EEOC investigation, Callaway was asked to identify any accommodation that he requested, the date the request was made, and to whom the request was made. In a written response to the EEOC investigator, Callaway said that he "was able to manage [his] conditions without special accommodations at work" but also identified one accommodation that was requested and denied in "August 2018."[6] Callaway's lost overtime claim occurred when he returned from FMLA leave on August 7, 2017. Callaway explained during his deposition that prior to his leave, he was assigned "extra responsibilities," such as working

---

[6] Callaway requested a separate hotel room at a conference so that he could avoid other colleagues consuming alcohol. Therefore, even if this claim had been timely, it would not be viable because DPS was not required to accommodate a condition that does not qualify as a disability. *See* TEX. LAB. CODE ANN. §§ 21.002(6)(A), 21.128(a).

26

crime scenes, which created opportunities for him to earn overtime wages. He said that once he returned from leave, he was not allowed to resume those responsibilities, and this negatively impacted his earning potential.

Because all three of these discrete claims occurred before October 10, 2018, the trial court is jurisdictionally barred from considering them. *See* TEX. LAB. CODE ANN. § 21.202(a); *Chatha*, 381 S.W.3d at 514. Accordingly, the trial court erred by not dismissing these claims for want of jurisdiction.

## C. Amended Charge

We disagree, however, that Callaway failed to exhaust his administrative remedies with respect to his termination-based claims. Callaway was terminated on October 12, 2020, and it is undisputed that he filed an amended administrative complaint on October 17, 2020, alleging that he was terminated because of his disabilities and as retaliation for filing his original charge of discrimination. Callaway received his right-to-sue letter a few weeks later. DPS suggests that the EEOC never actually investigated these new claims thereby thwarting the purpose of the administrative process. As support, DPS points to a document from EEOC's internal file that shows that an EEOC investigator recommended closing the complaint on August 13, 2020, before Callaway amended his complaint. Naturally, this internal communication did not discuss Callaway's termination because it had yet to occur.

Regardless, Callaway exercised his statutory right to amend his complaint, and he did so promptly after his termination and before the EEOC notified him of its final determination. *See* TEX. LAB. CODE ANN. § 21.201(e). In doing so, he also followed federal

27

and state guidance on how to raise discrete acts of discrimination and retaliation that occur after a charge has been filed. *See Simmons-Myers*, 515 F. App'x at 273; *Wernert*, 557 S.W.3d at 875. To the extent that the EEOC can impose a deadline for making amendments to a complaint, there is nothing in the record to suggest that it did so here. Thus, if the EEOC failed to investigate these timely allegations of subsequent retaliation and discrimination, as DPS suggests, we cannot fault Callaway for the EEOC's omission. DPS's exhaustion sub-issue is sustained in part and overruled in part.

## V.     PRE-TERMINATION DISCRIMINATION & RETALIATION

It is unclear which claims remain at this point. If we look solely at Callaway's petition, the only remaining claims involve his termination. However, the parties discuss two other pre-termination incidents that are not mentioned in Callaway's petition but that were otherwise raised in discovery: the internal investigation into Callaway reporting to work with detectable traces of alcohol in his system, and the other internal investigation into a complaint that Callaway improperly contacted a victim's family member during an ongoing murder investigation. Despite omitting these discrete acts from his petition, Callaway apparently contends that these disciplinary investigations were motivated by discriminatory animus and constituted retaliation. Because the parties discuss these unpled claims, we will address them. As part of its final sub-issue, DPS argues that Callaway failed to establish a prima facie case for discrimination or retaliation with respect to the two pre-termination disciplinary investigations because neither resulted in an adverse employment action.

As further discussed below, disability discrimination and retaliation are distinct

28

claims, but to establish a prima facie case for either claim, the plaintiff must show that they suffered an adverse employment action. *See Lara*, 625 S.W.3d at 61; *Alamo Heights*, 544 S.W.3d at 782. When Callaway reported to work with detectable traces of alcohol in his system, a fact he attributed to drinking kombucha tea that morning, it was determined that he should be suspended for a day without pay. However, during his deposition, Callaway acknowledged that he was never required to serve the suspension: "I never served the suspension sir. They never imposed the sentence. I was—I never took the day off." Consequently, Callaway did not suffer an adverse employment action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("[C]ourts have been unwilling to find adverse actions where the suspension is not actually served."); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) ("[A] rescinded reprimand does not rise to the level of an adverse employment action."); *Brooks v. Hous. Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 589 (S.D. Tex. 2015) ("The unimplemented decision to place Brooks on probation is not an adverse employment action and does not support her retaliation claim."); *Brandon v. Sage Corp.*, 61 F. Supp. 3d 632, 649–50 (W.D. Tex. 2014) ("The Court agrees that mere threats of pay reduction that never come to fruition would not dissuade a reasonable worker from making or supporting a charge of discrimination and that, therefore, they cannot constitute a materially adverse employment action."). The other investigation is likewise insufficient to show an adverse employment action because the allegation against Callaway was "not sustained," and consequently, Callaway was not disciplined. *See Breaux*, 205 F.3d at 158 ("Thus, Chief Barnett's non-sustaining the charges through internal procedures precluded an adverse employment result."). Lastly,

to the extent that Callaway alleges that he suffered an adverse employment action because of any stigma associated with these internal investigations, "[s]tigma by itself, without an impact on one's employment, does not constitute an adverse employment action." *Id.* at 158 n.14 (citing *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995)).

## VI.  TERMINATION

Callaway alleges that his termination on October 12, 2020, was retaliation for sending a letter to DPS complaining about disability discrimination on February 1, 2019, and filing a charge of discrimination with EEOC on March 28, 2019. He also claims that his termination was motivated by discriminatory animus. To prove these claims, Callaway offered a list of six comparators who he alleges were treated more favorably after violating similar department policies, i.e., a claim of disparate discipline. He alleges in his petition that none of these comparators filed a charge of discrimination or were part of his protected class. Callaway also alleged a "cat's paw" theory of liability. He acknowledged that Director McCraw was the final decisionmaker with respect to his termination but alleged that Chief Ruocco engaged in "discriminatory conduct" and that Director McCraw "relied completely upon the recommendation of Chief Ruocco" without conducting his own independent investigation.

DPS argues that Callaway cannot establish a prima facie case for either claim for two reasons: (1) his proffered comparators were not similarly situated; (2) and the evidence does not support a cat's paw theory.[7] DPS also contends that it had a

---

[7] DPS additionally argues that there is no evidence that any of the comparators were outside Callaway's protected class or engaged in a protected activity. However, DPS did not raise this no-evidence point in its motion for summary judgment; therefore, it is not properly before us. *See* TEX. R. CIV. P. 166a(i) ("The motion must state the elements as to which there is no evidence."); *McConnell v. Southside Indep.*

30

legitimate, nondiscriminatory, nonretaliatory reason for terminating Callaway, and Callaway has not produced sufficient evidence that this stated reason was false and pretextual.

We conclude that there is not a triable issue of fact on whether Callaway's protected activities were the but-for cause of his termination. We hold, however, that Callaway has raised a genuine issue of fact as to whether his PTSD was a motivating factor in his termination.

## A.    Applicable Law

To establish a prima facie case of disability discrimination, the plaintiff must show that he: (1) has a qualifying disability; (2) is qualified for the job; and (3) suffered an adverse employment decision because of his disability. *Lara*, 625 S.W.3d at 61. "A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not. Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint." *Alamo Heights*, 544 S.W.3d at 763–64. To establish a prima facie case of retaliation, the plaintiff must show: (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) there was a causal link between the two. *Id.* at 782. To prove causation in a discrimination claim, the plaintiff need only prove that discrimination was a motivating factor in the adverse employment action. TEX. LAB. CODE ANN. § 21.125(a); *Toennies*, 47 S.W.3d 473, 480 (concluding that the motivating-

---

*Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("A motion [for summary judgment] must stand or fall on the grounds expressly presented in the motion."). Nevertheless, we note that Chief Ruocco confirmed in his deposition that at least one of the comparators did not have a disability.

31

factor standard applies "in all TCHRA unlawful employment practice claims," regardless of whether the plaintiff presents a pretextual or direct-evidence case). Federal courts require a higher degree of causation for retaliation claims; retaliatory animus must be the but-for cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The Supreme Court of Texas has not decided this issue, but it has presumed without deciding that but-for causation is the appropriate standard, so we will do the same. *See Alamo Heights*, 544 S.W.3d at 783.

To establish a prima facie claim of discrimination or retaliation based on disparate discipline, Callaway was required to show that he was: (1) a member of a protected class or engaged in a protected activity; (2) qualified for his employment position; (3) terminated by the employer; and (4) treated less favorably than similarly situated employees who are not part of his protected class or who did not engage in a protected activity. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per cuiram). "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Off. of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 198 (Tex. 2020) (quoting *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam)).

A cat's paw theory of liability seeks to impute a supervisor's discriminatory or retaliatory animus to the final decisionmaker. *Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2015). In such cases, "[t]he plaintiff cannot show that the decisionmaker harbored any retaliatory [or discriminatory] animus." *Id.* Nevertheless, the employer is held liable "because the supervisors caused that decision through actions motivated by

retaliatory [or discriminatory] animus—in effect manipulating the decisionmaker into taking what appears to the decisionmaker to be a non-retaliatory[, non-discriminatory] action." *Id.*

**B.    Discrimination**

To begin, it is uncontested that Callaway's PTSD is a qualifying disability. As part of OIG's investigation into the January 15, 2020 incident, Callaway provided a written statement in which he expressly attributed his conduct that day to his "post-traumatic stress," which causes him to remain in an "elevated state of hypervigilance and awareness: fight or flight." He explained that this "excited state" is a result of "repeated exposure to trauma." His description of his symptoms is consistent with a diagnosis of PTSD. *See* DSM-5 Criteria for PTSD, Nat'l Ctr. for PTSD, U.S. DEP'T OF VETERANS AFFS., https://www.ptsd.va.gov/professional/treat/essentials/dsm5_ptsd.asp (last visited October 15, 2024) (explaining that a person with PTSD may suffer from emotional reactions called arousal symptoms, which may include hypervigilance, irritability, angry outbursts, or aggressive behavior).

It is also undisputed that Callaway violated DPS policies during the incident at his daughter's school. What Callaway takes exception to is the level of discipline he received. He contends that other officers had recently received lesser discipline for incidents where they also failed to control their emotions, escalated situations, were discourteous, misused or abused their position with DPS, and interfered with other officers performing their official duties. According to Callaway, the only meaningful distinction between himself and these other officers is the fact that he disclosed his PTSD diagnosis during

33

the internal investigation. We find it unnecessary to delve into the details of these incidents to determine whether these other officers were similarly situated because Callaway has raised a genuine issue of material fact on his cat's paw theory of liability.

There is direct evidence that Callaway's PTSD diagnosis was a motivating factor in Chief Ruocco's recommendation to terminate Callaway. At different points in time, Chief Ruocco provided conflicting testimony about what factors he considered in reaching his decision. During the administrative hearing before the Public Safety Commission of Texas, Chief Ruocco initially disclaimed that Callaway's mental health played any part in his recommendation, saying that he focused solely on Callaway's behavior in reaching his conclusion. He also acknowledged during the administrative hearing that if Callaway's mental health had been in question, then it would have been appropriate to have Callaway "assessed medically" before determining the appropriate course of action.

However, Chief Ruocco later admitted during his post-suit deposition that his concern about Callaway's "mental health" played a key part in his decision to recommend termination. He specifically cited Callaway's description of his PTSD symptoms, saying that he "locked in on that" when making his termination recommendation. Chief Ruocco also testified that he believed that Callaway suffered a dissociative episode during the incident because Callaway ordered the officers out of "his" office. We note that an employer is not liable for alleged discrimination based on a mental condition that impairs the individual's ability to reasonably perform a job. TEX. LAB. CODE ANN. § 21.105. Of course, as Callaway points out, Chief Ruocco is not a medical professional. And based on his own testimony, it appears that Chief Ruocco did not follow DPS policy, which

34

requires a professional medical evaluation when there is a concern that an officer is no longer fit for duty because of a possible physical or mental impairment. *See Jones v. Tex. Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *6 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.) (explaining that DPS has a written policy, titled "FITNESS FOR DUTY EVALUATION," which authorizes DPS to require an employee to "submit to a fitness for duty evaluation . . . by a qualified evaluator" when there is "(1) objective evidence that an employee may be unable to safely or effectively perform a defined job, and (2) a reasonable basis for believing that the cause may be attributable to a medical condition or impairment," which "may be physical or psychological"). Instead, Chief Ruocco decided the question of Callaway's "fitness for duty" based on his own unqualified conclusions about Callaway's mental condition and what it portended for the future. Despite a lack of similar conduct from Callaway's employment history, Chief Ruocco hypothesized that Callaway's condition meant that Callaway would be less capable of maintaining "control of his emotions" than some other officer who had simply lost their cool in a stressful situation. Chief Ruocco's supposition about Callaway's fitness for duty may eventually prove true, but his lay opinion is not competent summary judgment evidence, especially when DPS policy requires a medical professional to make this determination. *See id.*

DPS argues that Chief Ruocco's decision could not have been motivated by discriminatory animus because he averred in a supporting affidavit that he was unaware of Callaway's PTSD diagnosis at the time of his recommendation. *See Rodriguez*, 605 S.W.3d at 197 ("Without evidence that Duberney knew about the report, however, her

35

stated reasons could not be pretextual."). There are a couple of sticking points with DPS's position. First, even if we were to credit Chief Ruocco's affidavit, Callaway alleged both that he suffered from actual disabilities and that DPS regarded him as suffering from disabilities. *See* TEX. LAB. CODE ANN. § 21.002(6) (defining "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment"). In other words, regardless of Chief Ruocco's actual knowledge of Callaway's PTSD diagnosis, Callaway could still prevail by showing that Chief Ruocco regarded Callaway as disabled. *See id.* As discussed above, Chief Ruocco determined that Callaway's "mental health" issues made him unfit for duty.

Second, Chief Ruocco's affidavit is inconsistent with his prior deposition testimony, which strongly suggested that he was aware of Callaway's diagnosis when he made his recommendation. A defendant cannot conclusively prove the absence of a material fact "by submitting sworn testimony that materially conflicts with the same witness's prior sworn testimony, unless there is a sufficient explanation for the conflict." *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 87 (Tex. 2018). During his prior testimony, Chief Ruocco said that, prior to making his recommendation, he reviewed OIG's "entire investigative file," which included Callaway's written response to the investigation. In this written response, Callaway expressly disclosed his PTSD diagnosis and immediately thereafter described some of the symptoms he suffers because of his impairment and how they affected him during the incident. Chief Ruocco specifically cited these same symptoms during his deposition as reasons why he believed that Callaway was unfit for duty when he

36

recommended Callaway's termination, further reinforcing the reasonable inference that Chief Ruocco was aware of Callaway's diagnosis at the time of his recommendation. DPS has not offered any explanation for this material discrepancy between Chief Ruocco's affidavit and his prior sworn testimony. *See id.* Viewing the evidence in the light most favorable to the non-movant, Callaway has at least raised a genuine issue of material fact as to whether Chief Ruocco was aware of his disability when Chief Ruocco recommended his termination. *See Rodriguez*, 605 S.W.3d at 197.

DPS also argues that any discriminatory animus on the part of Chief Ruocco cannot be imputed to Director McGraw because he allegedly conducted his own independent investigation and reached the same conclusion. As a general matter, there is no per se rule that an independent investigation by the final decisionmaker negates the effect of the influencer's discriminatory animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (applying a cat's paw theory to a USERRA claim, which, like Chapter 21, requires the employee to show that unlawful animus was a "motivating factor" in the adverse employment action). Viewing the evidence in the light most favorable to Callaway, it appears to us, however, that Director McGraw's decision was tainted by the same discriminatory animus. We note that the only evidence we have from Director McGraw came from his brief testimony during the administrative hearing; he has not sat for a deposition in this case nor submitted an affidavit.[8] Nevertheless, his testimony

---

[8] DPS designated OIG investigator Lieutenant Patrick Heintz as its corporate representative to provide deposition testimony about Callaway's termination. During his deposition, Lieutenant Heintz confirmed that the OIG issues a report making factual findings but that an employee's chain of command ultimately decides whether to sustain the findings and what discipline, if any, is appropriate. It is unclear from the record whether Callaway has attempted to depose Director McGraw.

during the administrative hearing hit many of the same notes as Chief Ruocco's deposition testimony. Although he did not use the term "mental health," Director McGraw testified that his decision was also motivated, at least in part, by his determination that Callaway is incapable of controlling his emotions. And like Chief Ruocco, Director McGraw's assessment of Callaway's fitness for duty was based on his understanding of Callaway's explanation for his conduct rather than an evaluation of Callaway's condition by a medical professional, as provided for by DPS policy. In other words, although Director McGraw did not say it as plainly as Chief Ruocco, the record indicates that Director McGraw's decision to terminate Callaway was partly motivated by his perception of Callaway's disability.

But even if Director McGraw's testimony does not rise to the level of direct evidence of discriminatory animus, we conclude that Chief Ruocco's discriminatory animus can be imputed to the final decisionmaker in this case. Importantly, at DPS, discipline decisions that result in anything less than termination are handled by supervisors lower on the chain of command. Therefore, Director McGraw became the final decisionmaker in this case only *because* Chief Ruocco recommended termination; had Chief Ruocco concurred with Assistant Chief Reynolds's recommendation of a thirty-day suspension, the disciplinary decision would never have reached Director McGraw's desk. This fact alone demonstrates that Chief Ruocco had considerable influence over the discipline process and Callaway's eventual termination. *Id.* at 422 (holding that "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause

38

of the ultimate employment action, then the employer is liable" (footnote omitted)). Chief Ruocco also testified that during his time as the head of CID, Director McGraw agreed with his termination recommendations approximately nine out of ten times. This gives rise to a reasonable inference that Director McGraw generally followed Chief Ruocco's termination recommendations. *See id.* at 420 (recognizing that "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents" and that "[t]he one who makes the ultimate decision does so on the basis of performance assessments by other supervisors"). It also gives rise to a reasonable inference that Chief Ruocco appreciated the influence of his recommendations and that by recommending Callaway's termination, Chief Ruocco knew that termination would very likely be the outcome.

Callaway also claims that Chief Ruocco made materially false representations in his written recommendation that influenced Director McGraw's decision. For example, Chief Ruocco's recommendation states that "there were no mitigating factors," but he later admitted in his deposition that, pursuant to DPS guidelines, mitigating factors did exist in this case. According to Chief Ruocco, what he intended to write in his recommendation was that "there were no mitigating factors that were sufficient to bring it down from the presumptive penalty." Considering the importance of mitigating factors in assessing punishment under DPS's disciplinary matrix, we agree with Callaway that what Chief Ruocco said in his recommendation and what he allegedly intended to say are materially different.

Along similar lines, Chief Ruocco wrote in his recommendation that Callaway's "reluctance to accept responsibility" for his conduct was an aggravating factor supporting

termination. This statement is contrary to evidence that Callaway immediately apologized to the officers involved and later sent a letter of apology to the school district's police department. It is also inconsistent with the testimony of OIG investigator Lieutenant Patrick Heintz, who said during his deposition that Callaway was forthcoming and accepted responsibility during the investigation. It is also inconsistent with the assessment of Assistant Chief Reynolds, who recommended a thirty-day suspension rather than termination, in part, because Callaway had accepted responsibility for his actions, a conclusion that was supported by OGC because it was "consistent with the investigation." Essentially, Chief Ruocco took what should have been a mitigating factor and turned it into an aggravating factor by distorting the record. There is nothing in Director McGraw's testimony that shows that he was cognizant of the fact that Chief Ruocco's recommendation contained these material misrepresentations.

Viewing the totality of this evidence in the light most favorable to Callaway, a reasonable juror could find that Chief Ruocco's discriminatory animus was a proximate cause of Callaway's termination. *See id.* at 422. We conclude that there is a genuine issue of material fact as to whether Callaway's PTSD was a motivating factor in his termination.

## C.      Retaliation

Conversely, Callaway has failed to show a sufficient causal nexus between his protected activities (filing an internal complaint and an EEOC charge) and his termination. Unlike his termination claim, Callaway has no direct evidence of retaliatory animus. Even if we assume that Callaway has established a prima facie case of retaliation, it is undisputed that DPS offered a legitimate, non-retaliatory reason for his termination,

thereby shifting the burden back to Callaway to show that the stated reason was "false and a pretext" for retaliation. *See Alamo Heights*, 544 S.W.3d at 782. "The but-for causation standard [in retaliation cases] is significantly more difficult to prove than prima facie causation." *Id.* We consider "temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false." *Id.* at 790. Having considered these factors, we conclude that Callaway has not raised a fact issue as to whether he would not have been terminated but for his protected activities.

To be clear, it is undisputed that Callaway's misconduct was a serious violation of DPS policy. Callaway himself agrees that he should have been punished, including up to a thirty-day suspension. He also acknowledged in his deposition that the discipline administered in his case was "a judgment call." While there is some evidence that this "judgment call" was partially motivated by discriminatory animus, Callaway's case is already at the margin, and no reasonable juror could find that Callaway's protected activities were the but-for cause of his termination. DPS's final issue is sustained in part and overruled in part.

## VII. CONCLUSION

We affirm the trial court's judgment with respect to Callaway's claim that his termination was motivated by discrimination based on his PTSD disability. We reverse and render a judgment of dismissal for want of jurisdiction on the remainder of Callaway's

41

claims.

GINA M. BENAVIDES
Justice

Delivered and filed on the
17th day of October, 2024.